2SUSAN M. CHEHARDY, Judge.
The plaintiffs appeal a summary judgment that dismissed their medical malpractice suit against the defendant. We affirm.
At age 29 Donald Rovira suffered from avascular necrosis of both hips and underwent surgery for bilateral femoral bone grafts in April 1992. The surgery was performed by Dr. George Byram, Jr. The bone grafts failed; as a result, Mr. Rovira had to have total hip replacement surgery on the right side in August 1992 and on the left side in March 1993.
Mr. Rovira filed a medical malpractice claim against Dr. Byram. After proceedings before a medical review panel concluded in May 1996, Mr. Rovira and his wife, Julie Rovira, filed suit against Dr. Byram. They alleged that Dr. Byram performed the bilateral grafting of the hips without obtaining full and adequate informed consent from Mr. Rovira; that the bilateral graft of the hip was contraindicated because Mr. Rovira’s hips were too collapsed for the procedure to be successful; that Dr. Byram knew or should have known Mr. Rovira’s hips were too collapsed for the procedure to be successful; that Dr. Byram waited too long before consulting another physician concerning Mr. Rovira’s fever; that Dr. Byram improperly performed the total right hip replacement surgery and it was done without full and adequate informed consent; that Dr. Byram did not properly | .¡manage and did not advise the plaintiffs of the split of Mr. Rovira’s femoral shaft during the procedure; that the injuries sustained by Mr. Rovira while attempting to ambulate on August 7, 1992 were not properly managed; and that Dr. Byram waited too long before ordering a culture of the wound site.
Dr. Byram filed a motion for summary judgment. In support of the motion he attached a copy of the medical review panel’s opinion and reasons, in which the panel rendered a unanimous opinion that the evidence does not support the conclusion that Dr. Byram failed to meet the applicable standard of care as charged in the complaint.
The defendant attached an affidavit from Dr. Matko Milicic, a member of the medical review panel, attesting that the panel’s reasons for the opinion rendered were as follows: the indications for the bone graft surgery were present and the disease was not too far advanced for the procedure that was performed; the records indicate that the patient was adequately informed on surgical procedures; the patient suffered a recognized complication of the bone grafting procedure and his disease, which led to the total hip arthro-plasty both on the right and then later on the left; there was no evidence in the record of a deep wound infection or a bone infection; review of the records and x-rays indicate that there is no evidence that the right total hip replacement was improperly performed; a crack in the calcar is a very common occurrence in this procedure and was recognized and treated appropriately; small differences in limb length commonly occur following total hip replacement.
In further support of the motion the defendant submitted numerous other documents: portions of Donald Rovira’s medical records; a copy of the consent form signed by Donald Rovira; an affidavit by Michael Wallace, a medical assistant employed by Dr, Byram’s clinic; a medical report and deposition of Dr. J. |4Lee Moss; deposition testimony of Dr. Byram, Donald Rovira, Julie Rovira, Dr. Ronald P. Grel-samer (the plaintiffs’ expert witness), and *1011 Dr. Bernard Manale (who performed the left-hip replacement surgery on Mr. Rovi-ra); and a portion of the transcript from another medical malpractice suit by Donald Rovira against other physicians, in which the trial court refused to accept as an expert Dr. Richard Gardner, calling him “a charlatan and a liar” (Rovira v. McCord, No. 478021, Division “B,” Twenty-Fourth Judicial District Court).[1]
In opposition to the motion, the plaintiffs implicitly conceded that the only issue remaining before the court was whether Dr. Byram had obtained appropriate informed consent from Mr. Rovira before the bone graft surgery. The plaintiffs asserted that Dr. Byram led them to believe that the proposed bone graft surgery had greater than a fifty percent chance of success, when in fact the prospects of success from the bone graft were less than twenty percent. In support of their opposition the plaintiffs filed the affidavit of Mr. Rovira and the deposition of Dr. Ronald P. Grel-samer, the plaintiffs’ expert witness.
The trial court granted the motion, dismissing the claims, and the plaintiffs appeal.
The plaintiffs assert that summary judgment was inappropriate because there were material issues in dispute, specifically, whether Dr. Byram told Mr. Rovira that the prospects of success of the bone graft were low and whether Dr. Moss (from whom Mr. Rovira obtained a second opinion) told Mr. Rovira that there was a greater than eighty percent chance that the bone graft would fail. Mr. Rovira asserted in his affidavit that he would not have consented to the operation if he had been told that the prospect of success of the proposed surgical procedure was very | Rsmall. Dr. Grelsamer, Mr. Rovira’s expert witness, testified in deposition that the rate of success of bone grafts is about twenty percent and that the standard of care was violated if Mr. Rovira were not told about the small prospects of success of the bone graft surgery.
In opposition the defendant asserts the sole issue before the Court is whether Mr. Rovira was provided adequate informed consent by Dr. Byram prior to the bilateral bone grafting procedure in April 1992. The defendant contends there is no factual dispute and that he is entitled to judgment as a matter of law.
This Court recently restated the guidelines for appellate review of summary judgments in Johnson v. Hernandez, 01-575, pp. 8-9 (La.App. 5 Cir. 10/30/01), 800 So.2d 1055, 1058-1059, writ denied 01-3065 (La.12/14/01), 804 So.2d 640:
Louisiana Code of Civil Procedure Article 966 explains that summary judgment procedure is “designed to secure the just, speedy, and inexpensive determination of actions.” It is favored and shall be construed to accomplish these ends. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue of material fact and mover is entitled to judgment as a matter of law. The article farther provides that if movant will not bear the burden of proof at trial, movant’s burden does not require him to negate all essential elements of the adverse party’s claim. Rather, he need only point out that there is an absence of factual sup *1012 port for one or more elements essential to the adverse party’s claim. Finally, the statute provides that if the adverse party fails to produce factual support to show that he will be able to satisfy his burden of proof at trial, there is no genuine issue of material fact. It is well settled that appellate courts review summary judgments de novo, using the same criteria applied by the trial court to determine whether summary judgment is appropriate. Any decision as to the propriety of a grant of the motion must be made with reference to the substantive law applicable to the case.
Pursuant to LSA R.S. 9:2794, in order to prevail at trial plaintiffs must prove the applicable standard of care, a breach of that standard, and causation of injuries due to the breach. To defeat defendants’ Motions for Summary Judgment, plaintiffs must come forward with suffí-cient |fievidence to show they can meet their burden of proof at trial. [Citations omitted.]
La.R.S. 40:1299.40, the Uniform Consent Law, provides in pertinent part:
A. (1) Notwithstanding any other law to the contrary, written consent to medical treatment means a handwritten consent to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed.... Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
The pre-printed consent form that Mr. Rovira signed prior to his bone graft surgery listed the purpose of the surgery (“to try to restore circulation to both hips”) and listed risks known to be associated with the procedure (“death, brain damage, quadriplegia ..., paraplegia ..., loss of organ, loss of arm or leg, loss of function of an organ, loss of function or an arm or leg, disfiguring scars”). It also contained a pre-printed statement by the patient that said, “I hereby state that my physician has explained the operation/procedure to me. I have read and understand this consent, all questions about the procedure or procedures have been answered in a satisfactory manner, and that all blanks were filled in prior to my signature.”
Thus, the form broadly complied with La.R.S. 40:1299.40.
The Louisiana Supreme Court analyzed the issue of informed consent and La.R.S. 40:1299.40 in Hondroulis v. Schuhmacher, 553 So.2d 398, at 410 (La.1988) (on rehearing):
Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the |7general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment.
[[Image here]]
The doctor’s duty is to disclose all risks which are “material”. In broad outline, a risk is material when a reasonable person in what the doctor knows or should know to be the patient’s position, *1013 would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy.
The factors contributing significance to a medical risk are the incidence of injury and the degree of the harm threatened. If the harm threatened is great, the risk may be significant even though the statistical possibility of its taking effect is very small. But if the chance of harm is slight enough, and the potential benefits of the therapy or the detriments of the existing malady great enough, the risk involved may not be significant even though the harm threatened is very great.
The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. “Some” expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient’s position probably would attach significance to the specific risk. This determination of materiality does not require expert testimony.
[[Image here]]
There must be a causal relationship between the doctor’s failure to disclose material information and material risk of damage to the patient. Because of the likelihood of a patient’s bias in testifying in hindsight on this hypothetical matter, this court and others have adopted an objective standard of causation: whether a reasonable patient in the plaintiffs position would have consented to the treatment or procedure had the material information and risks been disclosed. [Citations and footnotes omitted.]
553 So.2d at 411-412.
[I]t is a reasonable and constitutional interpretation of the statute that a physician must disclose all known | «material risks to his patient, but only if the risk foreseeably may result in “death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, [or] disfiguring scars”, in order to qualify the written consent for the presumption of validity. These undoubtedly are the most serious types of damage which may result from medical treatment or surgery. If the risk is one that cannot foreseeably result in damage of this type it does not fall within the ambit of the statute. Accordingly, these damage categories serve to mark the limits of the legislated law and were not intended to deprive patients of the concrete case-specific material information that is essential to an informed and intelligent decision as to proposed treatment. [Citations and footnotes omitted.]
553 So.2d at 419.
We believe that ... an objective test of awareness is therefore more appropriate in interpreting and applying the statute. Accordingly, the physician is required to disclose material risks in such terms as a reasonable doctor would believe a reasonable patient in the plaintiffs position would understand. Technical language will not ordinarily suffice to disclose a risk to an untutored layperson; and abstract or blanket terms may not be adequate to communicate specific dangers. In order for a reasonable patient to have awareness of a risk, she should be told in lay language the nature and severity of the risk and the likeli *1014 hood of its occurrence. [Citations and footnotes omitted.]
553 So.2d at 421.
Consequently, a notice of risk of “loss of function of body organs”, without any description of the frequency of occurrence, the specific organ threatened or the cause of the damage involved, tends to deemphasize the severity and frequency of the hazard. By requiring the doctor to set forth the material risks “in general terms” the statute demands that he describe the main elements of each risk rather than limited details, but it does not permit him to “generalize” in the sense of making vague or indefinite statements that do not understandably communicate the specific material risks to the patient. Any other interpretation of the statute would frustrate rather than promote intelligent self determination by patients and thereby undermine the informed consent doctrine and the patient’s right to privacy. [Citations and footnotes omitted.]
553 So.2d at 421-422.
The question is whether the plaintiff has raised genuine issues of material facts as to whether Dr. Byram’s failure to tell him the odds of success of the bone graft were twenty percent was a misrepresentation of material fact that induced him to consent to the surgery.
In his deposition, Dr. Grelsamer stated there is a question of whether adequate and informed consent was provided to the plaintiff. He said that the bone-grafting procedure was an operation that had a low probability of success and the issue raised by the plaintiff is that he was not appraised of the low chance of success. Dr. Grelsamer based his opinion that the plaintiff was not adequately informed of the low probability of success on a combination of the plaintiffs own feeling that he had not given informed consent and the fact that Dr. Grelsamer did not see anything in writing to suggest that he had received the consent, other than Dr. Byram’s deposition.
According to Dr. Grelsamer, the standard of care regarding informed consent requires that “[Y]ou have a frank discussion with the patient with regards to the odds of success or failure and this is usually done in such a way that the patient has ample time to think it over and ask around and then make an informed decision.” By “ask around,” Dr. Grelsamer said, he meant obtaining a second opinion or discussing it with friends or looking it up on the Internet or in a library. He said he felt a minimum of two weeks time before the surgery would be “an absolute minimum” to allow the patient to review the options.
Dr. Grelsamer admitted that some people tell the doctor, “Whatever you say, doctor ... I’ll take your advice,” while other patients “are more inquisitive and want | mto do more research.” He stated that if adequate informed consent was not provided, it would be a deviation from the standard of care.
Dr. Grelsamer said a frank discussion with the patient would be “a discussion of what the probability of success of such an operation would be in this particular setting.” He stated that the odds of success for bone graft surgery are “low, ... perhaps less than twenty percent in a hip that already has been diagnosed [with avascu-lar neurosis]; this is something that has to be made clear to the patient.”
Grelsamer said that his review of the records gave him no evidence that there was adequate consent; he saw nothing in the consent form signed by Mr. Rovira or the office medical records of Dr. Byram that showed the doctor had informed Mr. Rovira of the odds of success. Asked *1015 whether in his opinion there would have been damage or harm done if informed consent was not provided in this case, Dr. Grelsamer said, “Well, as with any informed consent or lack thereof, the patient is deprived of the opportunity to make his or her own decision as to what is going to be performed on their body.”
Regarding other damage with respect to this patient, he said,
[A]s of right now, I don’t believe there was any particular harm other than the pain and increase[d] vulnerability to infection associated with the procedure.
[[Image here]]
Clearly, with each year that passes and each operation that is performed without him developing an infection, the lower the odds of that dormant bacteria coming to life.
So the answer is yes, by now I would have expected him to have developed an infection.
[[Image here]]
So to summarize, the risk of infection was there but does not seem to have materialized.
Dr. Grelsamer was asked, however, “If you were provided information that the procedure was discussed and Mr. Rovira did have time to ask around, would l^you find any deviation in the standard of care at that point?” Dr. Grelsamer replied, “No, I would not.” He also was asked, “Believing that all the options ... that several options were discussed with Mr. Rovira, would that change your opinion?” and he replied, “Most definitely, if it was done a few weeks before, absolutely.”
The defendant argues that Mr. Rovira knew that the prospects of success of the bone graft were small because he obtained a second opinion from Dr. Moss. The plaintiff contends, however, that argument is without merit because the statute requires the doctor who is going to perform the surgery to tell the patient the prospects of success, so what Dr. Mos's told Mr. Rovira is not relevant to the informed consent issue. Further, the plaintiff asserts, whether Dr. Byram did so is a disputed fact at this stage of the case and what Dr. Moss told Mr. Rovira also is a disputed fact.
Mr. Rovira testified that he first saw Dr. Byram on March 27, 1992 due to enduring severe right hip pain for approximately three months to thq, point that he “couldn’t take it any more.” He said Dr. Byram explained to him that he had avascular necrosis, which meant that “the bones themselves died.” He stated that Dr. By-ram described how the bone graft surgery would be performed and told him “that was the only way to go.” He admitted that Dr. Byram didn’t guarantee it, “[h]e just told me it was the only thing to do, and that’s what he thought should be done.” Asked whether Dr. Byram ever discussed total hip replacements prior to the bone graft surgery, Mr. Rovira said, “No, not really.”
Asked what he recalled Dr. Byram discussing with regard to the risks of the bone graft surgery, Mr. Rovira said, “I think he told me death ... excessive bleeding.... It was pretty much the same routine that I have heard from other doctors when I went in to see before, when you sign the papers for surgery.” He bssaid Dr. Byram told him the bone graft was “instead of having the hip replacement to try to grow the bones back.” He understood “that was the hope that I wouldn’t have to” have a hip replacement. He admitted he “knew people could have total hips,” but denied that Dr. Byram discussed that with him.
*1016 Mr. Rovira denied at first that he ever sought a second opinion prior to the bone graft surgery, although he said he asked Dr. Moss when he came into his room while he was recuperating after his hip replacement surgery. According to Mr. Rovira, Dr. Moss told him that “Dr. By-ram’s a good doctor” and “that’s all I can do for you.” Mr. Rovira subsequently admitted he may have seen Dr. Moss for a second opinion prior to the bone graft surgery, but he did not remember.
Dr. Byram testified that he recalled a long and extensive discussion with the Ro-viras at the time of Mr. Rovira’s initial visit. He said Mr. Rovira had very limited options: live with it; get a full-hip replacement; or do a bone graft to try to salvage the hip. Due to Mr. Rovira’s young age of 29, Dr. Byram thought it would be best to try to salvage the hip with bilateral bone grafting; he advised Mr. Rovira “that this would be painful for a number of months” and would require a number of months, “even two to three years to obtain final results.” He told Mr. Rovira “there was a small chance he might have some problems” with the allograft (i.e., use of cadaver bone rather than the patient’s own bone, which would have required additional surgery to harvest the bone). Dr. By-ram said, “I thought this was preferable to hip and joint replacement as this was the only other alternative.”
Dr. Byram admitted that among the things he is required to tell a patient are the material risks associated with the procedure and the likelihood of success, but said he doesn’t write down everything he says: “Whatever we have is what’s here, what’s in my records. I discussed things with them more than that. We had a long discussion about all of this.” He insisted he discussed with Mr. Rovira “in detail” |13the likelihood of success, although there were “no percentages spelled out.” Dr. Byram testified, “Everything is not included in here. I had a long discussion from the beginning about the problems with this whole thing.” Dr. Byram said further:
And that goes back to the very beginning when we initiated treatment that a total hip replacement in a young individual, age 29, is not a good long-term procedure. It will last five or six years. The incidence of failure is extremely high and revisions would be necessary on several occasions. And, with each revision, usually the results are worse, so he’s looking at a long-term serious problem for his future. That’s exactly the reason we embarked on the bone grafts, even though we knew there was not an overwhelming chance of success rate.
In her deposition Julie Rovira stated that she did not understand that an eventual hip replacement might be necessary “because Dr. Byram said the bone graft could work.” She said he did not give them a success rate and they did not ask him for a percentage chance of success.
Dr. J. Lee Moss testified that Donald Rovira had previously been a patient of his and came to him on April 3, 1992 for a second opinion on the bone graft surgery. Dr. Moss’ notes reflect the following:
He is here to discuss his options. Certainly, bone grafts, vascularized and non-vascularized, have been performed for this condition, and certainly these need to be done before collapse. There is no guarantee with this operative procedure. Further down the line, the patient may need to have total hips performed. These are also controversial in his age group, but certainly would be the end stage procedure.
The patient was told that there is some validity in doing nothing and just being treated with crutches, but, all of *1017 these treatment modalities are unsure and do not have a high rate of success.
He seems to understand his options and will certainly discuss this with Dr. Byram.
Dr. Moss recalled that visit with Mr. Rovira and considered it unsettling because, although he had treated him in the past, Mr. Rovira had not sought treatment from him for this problem. He said they discussed bone grafts for |uavascular necrosis of the hip, the fíbula head specifically; that it was a very controversial issue and there is no good treatment for avascu-lar necrosis to the hip. Dr. Moss said,
I had mentioned to him that doing nothing is an option.... I tried to explain to him that there was not many good options for the treatment of his condition. .. .However, being as young as he was doing anything to try to prolong and taking a chance even if it was a thirty percent good result, that in itself is a good chance because of his age for him at that time rather than going straight to a total joint replacement, which would be burning all your bridges after that operation.
Reviewing all of the testimony, we conclude that Dr. Byram’s failure to inform Mr. Rovira of the low percentage of success in bone grafts is not a genuine issue of material fact. Had Mr. Rovira not tried the bone graft first, he still would have had to undergo the hip replacements due to the severe avascular necrosis of his hip joints. The bone grafts were an effort to postpone the inevitable, because total hip replacement is highly undesirable for a person of Mr. Rovira’s young age and will require numerous adjustments/replacements in the remainder of his lifespan. Under the circumstances a reasonable patient in plaintiffs condition would have consented to the procedure had the percentages of success or failure of bone grafts been disclosed.
The objective “reasonable person” standard set out by Hondroulis, supra, does not depend on a plaintiffs self-serving testimony as to what he would have decided if all of the material risks had been disclosed. Hence, we conclude the trial court did not err and summary judgment was appropriate.
For the foregoing reasons, the judgment is affirmed. Costs of this appeal are assessed against the appellants.

AFFIRMED.

. Dr. Gardner is the doctor the plaintiffs originally intended to use as their expert in this suit against Dr. Byram. Due to his discredi-tation in the other suit, plaintiff found another expert, Dr. Grelsamer. Unlike Dr. Gardner, Dr. Grelsamer found no violation of the standard of care in Dr. Byram’s performance of the surgery, only in his failure to advise the plaintiff of the percentage odds of success of bone grafting.