MARION F. EDWARDS, Judge.
 

 | ^Plaintiffs/app ell ants, Charlotte H. Little (“Mrs. Little”) and John Little, D.D.S. (“Dr. Little”), appeal a summary judgment in favor of defendant/appellee, Micrus Corporation (“Micrus”), and a jury verdict in favor of defendants/appellees, Robert W. Dawson, M.D. and Louisiana Medical Mutual Insurance Company.
 

 The underlying facts are as follows: In 2001, Mrs. Little suffered a hearing loss and, in the course of diagnostic testing, discovered that she had a brain aneurysm. She was referred to Dr. Robert Tiel (“Dr. Tiel”), a neurosurgeon, for further evaluation. Mrs. Little’s options were to have an open craniotomy, an Rendovascular coiling procedure, or to have no treatment, although disclosure of these options is disputed. Mrs. Little stated that she did not want to undergo a craniotomy. Following her consultation with Dr. Tiel, Mrs. Little decided to undergo the angiogram and coiling procedure.
 

 She was referred to and consulted with Dr. Robert Dawson (“Dr. Dawson”), an interventional radiologist. Dr. Dawson noted that Mrs. Little perhaps had two aneurysms and was aware that she did not want to undergo a craniotomy. Dr. Dawson performed the angiogram and coil em-bolization on July 24, 2001. During the procedure, Dr. Dawson placed a coil, manufactured by Micrus, in the larger of the two aneurysms. While placing the second coil, the first coil dislodged, and, when it could not be removed successfully, Dr. Dawson placed an emergency consultation with Dr. Frank Culicchia (“Dr. Culicchia”). Dr. Culicchia performed a craniotomy and removed the coil. On the following day, another craniotomy was performed when Dr. Culicchia discovered that Mrs. Little had suffered a middle cerebral artery distribution infarct, or stroke. During these procedures the skull bone was not replaced due to swelling, but, on August 13, 2001, Dr. Culicchia performed a replacement of
 
 *594
 
 the bone. As a result of these problems, Mrs. Little suffered brain damage.
 

 Suit was filed against several defendants, including Dr. Dawson and his insurer. Micrus, the manufacturer of the coil, was sued for defective design and manufacture, failure to warn of the risks that the coils could dislodge, and spoliation of evidence. A subsequent petition alleged that a Micrus representative, Sue Young, was negligent in sizing the coil used. Pri- or to trial, Micrus filed a Motion for Summary Judgment, which was granted by the trial court, dismissing it from the lawsuit. The case against Dr. Dawson was heard by a jury, and, following | Rtrial, the jury returned a verdict in favor of Dr. Dawson. From these judgments, Mrs. Little has taken an appeal.
 

 INFORMED CONSENT
 

 In her first assignment of error, Mrs. Little urges the jury erred in rendering a verdict in favor of Dr. Dawson, as the evidence was uncontroverted that she was not advised about the material risk of coil migration and its attendant risk that a subsequent craniotomy would be necessary. No other issues of malpractice are before us.
 

 Prior to trial, a Medical Review Panel concluded that, among other things, with regard to Dr. Dawson and the issue of consent, “The complication that occurred was listed as a risk prior to the surgery.”
 

 At trial, Mrs. Little, a speech language pathologist, testified that she knew what an aneurysm was from her training and work with stroke patients. Dr. Tiel told her of the various treatment options available, but he did not discuss the risks and benefits of each. He advised her to undergo the coiling procedure. When she went to Dr. Dawson’s office, that physician looked at her MRI and told her they could be successfully coiled but that an angio-gram was necessary to determine the exact location of the aneurysms. Except for taking her vital signs, there was no physical examination. He did not discuss any risks associated with either the angiogram or the coiling, and he did not tell her of any risks involving coil migration. The consultation took approximately five minutes. Dr. Dawson handed her the consent forms and told her to read and sign them. At the time she signed them they were not filled in.
 

 Mrs. Little testified that she was anesthetized during the procedure, but near the end she heard Dr. Dawson state that he had “hit” the middle cerebral artery.
 

 In At trial, a consent form signed by Mrs. Little was admitted. On July 23, she signed a consent for “cerebral angio em-bolization of aneurysm” to “define and treat aneurysm(s) with endovascular coils.” This document, thus, combined consent for an angiogram and coiling. Reasonable therapeutic alternatives and the risks associated with such alternatives are listed as: “open surgery — same risks.” The portions of the agreement in parentheses were filled in by hand. The printed material risks were listed on an attached page and included stroke, inability to speak, and paralysis.
 

 Dr. Little testified that, when Mrs. Little consulted Dr. Tiel, she was told her aneurysm could be treated by either an open craniotomy or by the coiling procedure. Dr. Little accompanied his wife on her office visit to Dr. Dawson. Her appointment was at 1:00 p.m., and she told him she was there just to sign forms. She returned five minutes later, telling him she had signed the documents. They then went to the hospital for some pre-operative tests. When she was admitted, Dr. Dawson told him that if the angiogram showed the aneurysm was optimal for coiling, he
 
 *595
 
 would perform the procedure. If it could not be performed, Mrs. Little would have to return for a craniotomy. After Mrs. Little had been in the procedure room for some time, Dr. Dawson came out and explained that “things have gone wrong” and that he had called a neurosurgeon because the coil had dislodged. Dr. Little later signed consent forms for the craniotomy. Following the first procedure, Mrs. Little’s head began to swell, necessitating a second surgery on the following day. About two weeks later, a third operation was performed to attempt to clip the aneurysm and repair Mrs. Little’s skull. The aneurysm was not amenable to clipping.
 

 Dr. Tiel, the referring neurosurgeon, testified that, after the aneurysms were discovered, he recommended that Mrs. Little have an arteriogram to better define |7her condition. He advised her that she could have a craniotomy, whereupon the artery would be partially dissected and “clipped” to prevent it from growing. Her second option was endovascular coiling, and the third was to do nothing. She did not want the craniotomy. In Dr. Tiel’s opinion, the risk of coil migration should have been indicated on the consent form, as it indicates a potential problem. However, Dr. Tiel was not aware of the rate of coil migration at the time of the operation. In his own practice, he does not give a detailed list of all surgical maneuvers but gives a general idea of what will happen. In the consenting process, it is important to indicate when a secondary operation may be necessary.
 

 Dr. Dawson testified that Dr. Tiel referred Mrs. Little to him specifically for the coiling procedure. He specifically remembered his conversation with Mrs. Little. She told Dr. Dawson that she had come for the procedure, if it could be done, and that she did not want a craniotomy. When she came into the office, he conferred with her for approximately thirty minutes, going over her history and discussing her options, listed above, with her, including the chances over her lifetime of a spontaneous rupture. Because of her hypertension and the existence of a second aneurysm, her aneurysm was somewhat more likely to rupture. Endovascular therapy would require an angiogram to confirm that a coiling procedure was possible. The risks of complications from the arteriogram, mainly a stroke, were about one in a thousand. If she had a coil embolization or surgery, the same types of risks apply, but the percentage of complications would be about two and a half to three percent. Dr. Dawson “absolutely told her there was a possibility of a stroke,” and discussed the risks with her as they went over the consent forms.
 

 Q: [D]id you ever tell Ms. Little there was a risk that the coil would migrate out of the aneurysm, specifically?
 

 A: I told her that the risks of the procedure were perforation and stopping up a blood vessel.
 

 IsQ: Let me ask the question again: at no time — I think you’re agreeing with me — at no time did you tell her, “Charlotte, there’s a chance this coil could get loose in your brain.”
 

 A: I told her we could stop up a blood vessel. I did not tell her the mechanism that this was because the effect on the brain is the same. If you stop up a blood vessel, it’s a stroke. We’re talking about harm, not mechanism.
 

 According to Dr. Dawson, complete or partial coil migration, as a complication, is too unusual to put in terms of percentage. A coil could migrate and not harm the patient. Only the risks of harm, not the technical aspects of a procedure, are listed on a consent form for surgery. Mrs. Little understood that if complications arose, she would be treated for them.
 

 
 *596
 
 During Mrs. Little’s surgery, the first coil in the larger aneurysm was placed and sat well, allowing other coils to be deployed to fill the aneurysm. When Dr. Dawson attempted to seat the second coil, the first one became dislodged into the cerebral artery. He called Dr. Culicchia and meanwhile attempted to snare the coil to extract it. Dr. Culicchia recommended surgery.
 

 Dr. Dawson had received instructions via documents from Micrus regarding the use of the coil. The packaging information made no sense to him, so Dr. Dawson discussed it with a company representative. Dr. Dawson was told to essentially ignore a section labeled “Instructions for Use.”
 

 Dr. Culicchia, a neurosurgeon, testified that, on the morning of the first procedure, he was notified that he had to report to the angiogram suite. After viewing the angio-gram that had just been performed, he realized the artery had to be opened. Meanwhile, he asked Dr. Dawson to continue to attempt to retrieve the coil. When Dr. Dawson was unsuccessful, Dr. Culicchia proceeded with the surgery and removed the coil. In his opinion, the angi-ographic criteria supported the initial finding that the aneurysm could and should be treated with coils. | ciRemoval of a migrated coil is not always necessary unless the coil has resulted in a clot formation. Many patients have coils, which have migrated and blood flow is fine. In Mrs. Little’s case, however, the coil caused the obstruction of blood supply to a portion of her brain, leading to the stroke and necessitating the emergency craniotomy.
 

 After the first surgery, Mrs. Little’s brain was very swollen, and necrotic tissue had to be removed. During the third surgery, Dr. Culicchia noted that it was a “wide neck” aneurysm, which type of aneurysm has a high incidence of coil migration. However, it is very difficult to determine the proper “neck to dome” ratio of an aneurysm located in the middle cerebral artery.
 

 Dr. Charles Kerber was qualified as an expert witness in the fields of radiology, interventional radiology, and endovascular neurosurgery, including the issue of informed consent. After reviewing the pertinent documents and records, Dr. Kerber testified that, in his opinion, the consent form was reasonable and adequate and that the recommendation for coiling was appropriate and reasonable. Even a good coiling procedure has risks for death, stroke, or blindness. According to the an-giogram, the neck of the larger aneurysm indicated that a coil would likely stay and that Mrs. Little’s aneurysm was coilable. The risks set forth on the consent form for the cerebral angiogram are the same risks a patient would encounter in a coiling procedure, and the list of technical issues that can occur in surgery are essentially infinite. Coil migration is a technical problem that can result in complication, and the potential complication should be disclosed to the patient.
 

 Dr. Edward Connolly, a neurosurgeon, testified as a member of the Medical Review Panel. He stated that the type of aneurysm from which Mrs. Little suffered was an excellent candidate for coiling but is frequently difficult to clip. He opined |10that the consent form gave adequate and reasonable consent. The list of technical problems that could occur would be nearly infinite. It would be unusual for a physician to tell a patient they might need surgery for some unforeseen occurrence. The chances of Mrs. Little needing an open craniotomy even if she had an embo-lus were not great. If Mrs. Little signed a blank consent form, it would be below the standard of care. However, if she knew of the risks before she signed the form, such
 
 *597
 
 would indicate the patient received informed consent.
 

 The standard of review on appeal is as follows:
 

 It is well-settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong.... To reverse a fact-finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and that the record establishes that the finding is clearly wrong.
 
 Mart v. Hill,
 
 505 So.2d 1120 (La.1987). Where the jury’s findings are reasonable, in light of the record viewed in its entirety, the court of appeal may not reverse. Even where the court of appeal is convinced that it would have weighed the evidence differently to reach a different result, reversal of the trial court is improper unless the trial court’s ruling is manifestly erroneous, or clearly wrong....
 

 [[Image here]]
 

 ... [Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, where conflict exists in the testimony.... However, where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would not credit the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. ...
 
 [1]
 

 The law on the issue of informed consent is both statutory and jurisprudential. LSA-R.S. 40:1299.40, in pertinent part, states:
 

 | n A. (1) Notwithstanding any other law to the contrary, written consent to medical treatment means a handwritten consent to any medical or surgical procedure or course of procedures which: sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of. any organ or limb, of disfiguring scars associated with such procedure or procedures; acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner; and is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
 

 When the alleged malpractice is based on lack of consent, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent. LSA-R.S. 40:1299.40 (in 2001).
 

 The doctor’s duty is to disclose all risks which are “material”.... In broad outline, a risk is material when a reasonable person in what the doctor knows or should know to be the patient’s position, would be likely to attach significance to the risk or cluster of risks in deciding
 
 *598
 
 whether or not to forego the proposed therapy....
 

 The factors contributing significance to a medical risk are the incidence of injury and the degree of the harm threatened. If the harm threatened is great, the risk may be significant even though the statistical possibility of its taking effect is very small. But if the chance of harm is slight enough, and the potential benefits of the therapy or the detriments of the existing malady great enough, the risk involved may not be significant even though the harm threatened is very great....
 

 The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. “Some” expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the 112likeIihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient’s position probably would attach significance to the specific risk. This determination of materiality does not require expert testimony....
 

 There must be a causal relationship between the doctor’s failure to disclose material information and material risk of damage to the patient.... Because of the likelihood of a patient’s bias in testifying in hindsight on this hypothetical matter, this court and others have adopted an objective standard of causation: whether a reasonable patient in the plaintiffs position would have consented to the treatment or procedure had the material information and risks been disclosed....
 
 [2]
 

 Encompassed in the definition of material risks is the concept that in order for a patient to make an informed, intelligent decision, he must be advised of any alternatives to the proposed procedure.
 
 [3]
 
 The physician is required to disclose material risks in such terms as a reasonable doctor would believe a reasonable patient in the plaintiffs position would understand. Technical language will not ordinarily suffice to disclose a risk to an untutored layperson; and abstract or blanket terms may not be adequate to communicate specific dangers. In order for a reasonable patient to have awareness of a risk, she should be told in lay language the nature and severity of the risk and the likelihood of its occurrence.
 
 [4]
 

 In the present case, Mrs. Little contends that withheld information concerning the Micrus manufacturer’s warnings coupled with a failure to disclose the known complication of coil migration were things to which she would have attached significance in her decision making process. The portion of the Micrus insert to which Mrs. Little refers states that the coil system “is intended for [ ^embolization of intracranial aneurysms that — because of their morphology, their location or the patient’s general medical condition — are considered by the treating neurosurgical team to be a) very high risk for management by tradi
 
 *599
 
 tional operative techniques or b) inoperable”.
 

 As Dr. Dawson pointed out in his testimony, Mrs. Little’s decision to forego a craniotomy made her condition inoperable by definition. Therefore, we fail to see how disclosure of this information would have changed the outcome. Further, the manufacturer’s information included infection, stroke, and death as possible complications of the procedure and, as outlined above, these risks were disclosed in the written consent forms. With regard to coil migration, the question is whether Mrs. Little would have attached significance to that specific risk.
 

 The evidence at trial shows that the incidence of coil migration, as of the time of the procedure, was “too unusual to put in terms of a percentage,” and that coil migration does not inevitably cause harm or require removal. Thus, it is questionable that the possibility of migration was a material risk as defined by the jurisprudence. The initial harm that Mrs. Little suffered, that of a stroke, was listed as a potential complication of both the angio-gram and the coiling procedure. As we understand it, migration and/or the attempted removal were the mechanisms that caused the stroke and led to the emergency surgeries. Mrs. Little failed to prove that she would have attached particular significance to the fact that a stroke could be caused by coil migration rather than by another means inherent in an invasive brain procedure. In other words, Mrs. Little was aware that a stroke was a possible complication of such a procedure. There is no evidence that the possibility of coil migration made the chances of suffering a stroke more probable. Even if coil migration were defined as a material risk, the resulting harm, a stroke, was satisfactorily disclosed in the consent form.
 

 | ]4Mrs. Little urges that the consent form was blank when she signed it, after only five minutes of consultation with Dr. Dawson, who did not discuss any risks associated with either the angiogram or the coiling, and who did not tell her of any risks involving coil migration. Dr. Little confirmed that time frame. Dr. Dawson specifically recalled the consultation, which he stated took about thirty minutes and during which he went over each possible complication with her. The form stated that surgery carried the same material risks as the other procedures. Moreover, the signed form states that all blanks were filled in prior to signing, that she had the opportunity to ask questions regarding risks and alternatives, and that her questions had been answered. The credibility determination apparently made by the jury was reasonable, and, in the absence of evidence that the consent was obtained by misrepresentation, under LSA-R.S. 40:1299.40 we must presume that the consent was valid.
 
 [5]
 

 It is inarguable that Mrs. Little did not want to undergo an open craniotomy and that she chose the intervention that she believed to be the least invasive. However, the ensuing complications clearly required emergency surgery, to which Dr. Little validly consented. Although we sympathize with Mrs. Little’s plight, we cannot find manifest error in the jury’s verdict.
 

 SUMMARY JUDGMENT
 

 Appellate courts review the trial court’s grant of summary judgment de novo, viewing the record and all reasonable inferences that may be drawn from it in the
 
 *600
 
 light most favorable to the non-movant.
 
 [6]
 
 A motion for summary judgment should be granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue 11fias to material fact and that mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B). A material fact is one that potentially insures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. A genuine issue exists when reasonable persons could disagree.
 
 [7]
 
 However, if reasonable persons could reach only one conclusion, summary judgment is appropriate.
 
 [8]
 
 Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case.
 
 [9]
 

 Mrs. Little contended that Micrus was liable due to the defective design, manufacture, and failure to properly warn of the risk of coil migration. A supplemental petition added that a Micrus representative, Sue Young (“Ms. Young”), was negligent in “sizing” the particular coil used and that the coil, after its removal, was given to a Micrus representative, who intentionally discarded it to prevent inspection. In dismissing Micrus from the lawsuit on summary judgment, the trial court determined that Mrs. Little did not prove that the warning on the product was not inadequate and that there was no viable action against Ms. Young for negligence. The court further found in favor of Micrus on the issue of spoliation, and, following this conclusion, determined that Mrs. Lit-tie had not produced any evidence of defective design. On appeal, Mrs. Little contests the findings of the court with regard to inadequate warning and spoliation.
 

 Ms. Young’s deposition was admitted in connection with the Motion for Summary Judgment. She stated that she trained physicians and staff at hospitals in the intricacies of the Micrus coil and was present during the procedure on Mrs. Little. She testified that, if there is a complication that happens with a device, |1(iMicrus asks the physician to save it and return it to Micrus. However, Ms. Young did not know what became of the coil after it was removed as it was not given to her. After the surgery, she called Bill Gore of Micrus to report what happened and wrote a report. She was unable to find the report, and probably threw away “last year all my stuff and unfortunately, that went with it.” Eric Leopold, a Micrus representative to whom she sent the report, was also unable to find any copy of the report. We note Ms. Young’s deposition was taken in 2004; suit had been filed in July of 2002 and service obtained against Micrus in August 2002.
 

 Ms. Young believed that she sent the report to Micrus by e-mail, and that she had verbal confirmation that it had been received. However, in this case Ms. Young did not perceive the problem to be a malfunction of the coil, so she did not ask to see the device or have it saved.
 

 Attached to the opposition is a copy of a confidential report on the matter, prepared by Micrus. The report indicates that initial notification of the event was October 28, 2002, and, after describing the event is
 
 *601
 
 the comment: “The product was not returned to Micrus. No product malfunction is alleged.” A report to the FDA generated and dated that same day reiterates that no malfunction had been alleged.
 

 A portion of Dr. Culicchia’s deposition was admitted in connection with the opposition to the motion. In that deposition, Dr. Culicchia stated that, after he removed the coil, he handed it to the person who hands him instruments, the scrub nurse or surgical technician, but he did not know who that was. He did not know what became of the coil, although it was his “best recollection” that Ms. Young was given the coil.
 

 The theory of “spoliation of evidence” refers to an intentional destruction of evidence for purpose of depriving opposing parties of its use.... A plaintiff 117asserting a state law tort claim for spoliation of evidence must allege that the defendant intentionally destroyed evidence. Allegations of negligent conduct are insufficient.... Where suit has not been filed and there is no evidence that a party knew suit would be filed when the evidence was discarded, the theory of spoliation of evidence does not apply.... The tort of spoliation of evidence has its roots in the evidentiary doctrine of “adverse presumption,” which allows a jury instruction for the presumption that the destroyed evidence contained information detrimental to the party who destroyed the evidence unless such destruction is adequately explained.
 
 [10]
 

 We find on review that questions of fact exist regarding whether or not Ms. Young received the coil following surgery. She testified that she did not; Dr. Culicchia recalled that it was given to her. Whether or not she received it at that time is a credibility determination not properly determined by summary judgment. We agree with the trial court that it is a prerequisite to a state law tort claim for spoliation of evidence that a party knew suit would be filed when the evidence was discarded and that suit had not been filed as of the time of the surgery. Implicit in this finding, however, is a factual determination, that is, that the coil was disposed of prior to suit having been filed, that is, at the time of the surgery. Even though summary judgment is now favored, it is not a substitute for trial on the merits, and it is inappropriate for judicial determination of subjective facts, such as motive, intent, good faith, or knowledge that call for credibility evaluations and the weighing of the testimony.
 
 [11]
 

 In this regard, we are further troubled on the subject of the inaccuracies in the reports generated by Micrus to the FDA, regarding notice and its statement that no product malfunction had been alleged well after suit had been filed and served on Micrus. We note as well the fact that the report made by Ms. Young was | ^thrown away over a year after suit had been filed, and such report may well go toward the issue of spoliation.
 

 Micrus urges that, even if Mrs. Little’s version of events is correct — that is, that the device was disposed of deliberately— Mrs. Little cannot establish a cause of action for spoliation under the Louisiana Products Liability Act because destruction of the evidence has to impair the plaintiffs civil claim in order to have a cause of action. Mrs. Little alleged that Micrus was liable in part due to the defective
 
 *602
 
 manufacture of the coils causing failure during the procedure, a cause of action encompassed by LSA-R.S. 9:2800.55. It is evident to this Court that destruction of the device distinctly impairs that cause of action.
 

 On our review, we find the above questions of material fact preclude summary judgment and set it aside. Because of this finding, we decline to address any remaining issues with regard to that judgment.
 

 For the foregoing reasons, the jury verdict is affirmed. The summary judgment is reversed and set aside, and the matter remanded to the trial court for further proceedings.
 

 AFFIRMED IN PART; REVERSED IN PART; REMANDED.
 

 [1]
 

 .
 
 Rabalais v. Nash,
 
 2006-0999 (La.3/9/07), 952 So.2d 653, 657 (some citations omitted).
 

 [2]
 

 .
 
 Hondroulis v. Schuhmacher,
 
 553 So.2d 398, 411-12 (La.1988) (citations omitted).
 
 Also see, Rovira v. Byram,
 
 02-1115 (La.App. 5 Cir. 2/25/03), 841 So.2d 1009,
 
 writ denied,
 
 2003-0784 (La.5/9/03), 843 So.2d 407.
 

 [3]
 

 .
 
 Kennedy v. St. Charles Gen. Hosp. Auxiliary,
 
 630 So.2d 888 (La.App. 4 Cir.1993),
 
 writ denied,
 
 94-0269 (La.3/18/94) 634 So.2d 863.
 

 [4]
 

 .
 
 Hondroulis, supra; Rovira, supra.
 

 [5]
 

 .
 
 See, e.g., Cherry v. Herques,
 
 623 So.2d 131, 135 (La.App. 1 Cir.1993).
 

 [6]
 

 .
 
 Nugent v. On-Call Nursing Agency & Assoc. of New Orleans, Inc.,
 
 07-1022 (La.App. 5 Cir.3/25/08), 983 So.2d 128 (citing
 
 Hines v. Garrett,
 
 04-0806 (La.6/25/04), 876 So.2d 764).
 

 [7]
 

 .
 
 Nugent, supra.
 

 [8]
 

 .
 
 Smith v. Our Lady of the Lake Hosp., Inc.,
 
 93-2512 (La.7/5/94), 639 So.2d 730.
 

 [9]
 

 .
 
 Nugent, supra.
 

 [10]
 

 .
 
 Desselle v. Jefferson Hosp. Dist. No. 2,
 
 04-455 (La.App. 5 Cir. 10/12/04), 887 So.2d 524, 534 (citations omitted).
 

 [11]
 

 .
 
 S.J. v. Lafayette Parish Sch. Bd.,
 
 2006-2862 (La.6/29/07), 959 So.2d 884.