# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 11-216

**DEBRA MILLER AND ED GEASLIN**

**VERSUS**

**PNK, D/B/A L'AUBERGE DU LAC CASINO AND HOTEL**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2007-5591
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## SHANNON J. GREMILLION
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

**David John Calogero**
**Philip Andre Fontenot**
**Lindsay Deblois**
**Davidson, Meaux, Sonnier, McElligot, Fontenot, Gideon & Edwards, L.L.P.**
**P. O. Drawer 2908**
**Lafayette, LA 70502**
**(337) 237-1660**
**Counsel for Defendant/Appellee:**
**PNK (Lake Charles), LLC d/b/a L'Auberge Du Lac Casino and Hotel**

**James B. Doyle, Sr.**
**Heath J. Dorsey**
**Law Offices of James Doyle, APLC**
**One Lakeshore Dr., Suite 1805**
**Lake Charles, LA 70629**
**(337) 433-5999**
**Counsel for Plaintiff/Appellant:**
**Ed Geaslin**

**GREMILLION, Judge.**

The plaintiff, Ed Geaslin, appeals the jury's verdict in favor of the defendant, PNK, d/b/a L'Auberge Du Lac Hotel and Casino. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In March 2007, Geaslin and his companion at the time (who later became his wife), Debra Miller, were gambling at a poker table at L'Auberge. A L'Auberge employee approached Miller, pulled her aside, and informed her that she needed to discontinue drinking alcoholic beverages for a period of eight hours. She was further instructed to gather her chips so that she could redeem them and, thereafter, leave the casino. After cashing out, Miller and Geaslin began arguing with L'Auberge personnel. Geaslin claims that when he attempted to intervene between a security guard who was trying to remove Miller's cell phone, he was attacked and "tackled . . . to the floor with brute force." Geaslin claimed in his petition that the security guards "began placing their knees in the back of his leg and punching him in the face. A security guard was jumping up and down with his knee on the back of [his] leg." Geaslin filed suit against L'Auberge in September 2007 for personal injuries.

Following a four-day trial, the jury rendered a verdict finding that L'Auberge was not at fault in any of the causes of action alleged by Geaslin. Geaslin filed a motion for Judgment Notwithstanding the Verdict (JNOV), which was denied by the trial court. Geaslin now appeals and assigns as error:

1. The jury legally erred by ignoring the instruction of law by the trial court and ruling in favor of the Defendants and against Plaintiff and,

2. The trial court erred by refusing to grant his motion for JNOV.

## DISCUSSION

A court of appeal may not set aside a jury's finding of fact in the absence of manifest error or unless it is clearly wrong. *Rosell v. Esco,* 549 So.2d 840 (La.1989).

> The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

*Id.* at 844.

Though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Id.* "[W]here two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Stobart v. State Through DOTD,* 617 So.2d 880, 883 (La.1993). "[T]he issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one." *Id.* At 882.

Geaslin reviews the manifest error standard in this assignment of error but argues that the "legal error of the jury was in failing to follow the clear instructions of the court." Therefore, he argues, we should discard the manifest error standard and conduct a de novo review. Geaslin never states which instructions the jury failed to follow or provides any other argument in this regard other than the quoted claim above. This argument lacks merit and we, therefore, limit ourselves to a manifest error review of the jury's finding.

The jury was called upon to decide if L'Auberge exercised reasonable care in removing Geaslin from the casino and if the force used was excessive. In

*Saucier v. Players Lake Charles, LLC*, 99-1196, p.7-8 (La.App. 3 Cir. 12/22/99), 751 So.3d 312, 317, we stated:

> A determination of excessive or unnecessary force is a finding of fact which may not be disturbed unless: (1) the record evidence does furnish a sufficient basis for the finding; or (2) that finding is clearly wrong. *See Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). . . .

> In *Kyle v. City of New Orleans,* 353 So.2d 969 (La.1977), the supreme court sets forth several factors to consider in making a determination of whether the force used was reasonable under the circumstances. The factors include: (1) the known character of the arrestee; (2) the risks and dangers faced by the officer; (3) the nature of the offense or behavior involved; (4) the chance of escape if the particular means are not employed; (5) the existence of alternative methods of arrest or subduing the arrestee; (6) the physical size, strength and weaponry of the officers as compared to that of the arrestee; and (7) the exigencies of the moment. *See Picou v. Terrebonne Parish Sheriff's Office*, 343 So.2d 306 (La.App. 1 Cir.), *writ denied,* 345 So.2d 506 (La.1977).

Having reviewed the evidence, we find that reasonable people could conclude that L'Auberge exercised reasonable care and did not use excessive force in removing Geaslin from the casino. The following testimony was elicited at trial.

Debra Miller testified that she was fifty-four years old at the time of the incident. She testified that she had been to the L'Auberge many time before. She said that she and Geaslin gambled at L'Auberge starting the night before the incident. She admitted that she and Geaslin brought two large insulated "Big Gulp" beverage containers with them to gamble the night before the incident. She said that no one asked them to remove them until the night of the incident. Miller testified that she was not drunk, but had had three, four, or five alcoholic drinks. However, on cross-examination she recalled stating that she had at least five alcoholic beverages that night.

Miller reviewed the videotape, noting that a lady approached her while she was seated at a table in the casino playing "three card poker" and asked if she

3

could speak to her. Miller said that the lady informed her that she could not drink any more alcohol for eight hours. Miller said that she was informed that she was unable to gamble if she was not drinking so she had to leave. Miller said she told Geaslin that she needed to leave, collected her chips that remained on the table, and proceeded to the "cashier's cage" to cash in her chips. Miller was accompanied by Geaslin. Miller stated that she was confused as to why she was being asked to leave and requested to see a manager to clarify to her satisfaction why she was being asked to leave. Miller then said that she requested a wheelchair because her back was hurting.

Miller described the recorded events noting that Geaslin referred to one of the employees as a "lying bitch" because the employee stated that she and Geaslin had been drinking all day. Miller testified that she and Geaslin had new cell phones and she was not sure how to operate hers, but that she was attempting to take a picture of the situation.

Miller said that Geaslin had his back to her and that he saw security officer, David Shelton, reach around her to retrieve the phone. Miller said Shelton told her she could not take pictures and showed her the sign that indicated no pictures were allowed. She said Geaslin never used the "F" word. Miller denied ever slurring her speech. She admitted claiming that one of the officers punched Geaslin in the face in her petition and prior to seeing the videotape. When confronted with the videotape, Miller said was not sure if anyone punched Geaslin in the face.

Geaslin testified that he was sixty-three at the time of the incident. He said that on the first night at L'Auberge he had been drinking "considerably" that evening. He said that he had won about $30,000 in the "high roller room." He admitted to being inebriated to the point that he requested that the casino bring

him a wheelchair to bring him back to his room. Geaslin testified regarding the "Big Gulp" cups. He stated that he brought them back to the room after L'Auberge personnel requested that he do so. Geaslin stated that at the time Miller was asked to leave he had consumed two drinks, which was not a lot for him. Geaslin said that he told Miller the employee was a "lying bitch" loud enough so the employee could overhear him. He denied using any other vulgar language.

Geaslin recalled a conversation with security officer, Willie Dartez, testifying as follows:

> He came up and stuck his face right in mine, big flaring nostrils, halitosis that would have gagged a buzzard, and I told him if he didn't want trouble to back off, because they had made a lunge at Debbie, and I tried to get between them, for all the good it would have done, but it would have at least helped, I think.

Geaslin stated that the security officers "lunged" at Miller. He further stated that he thought they were grabbing Miller so he reached his left arm out and then they came down on him. He said he was handcuffed and taken to the police station and booked.

Although Geaslin claimed to have arrived at the casino sometime around 3:30 p.m. on the date of the incident, on cross-examination, he admitted that he played blackjack from 10:29 a.m. until 1:17 p.m. the day of the incident and that he "could have been" drinking during that time. Geaslin admitted to drinking three-quarters of a pint of rum every day and that he had more than two alcoholic beverages the day of the incident. Geaslin then reviewed the videotape with counsel and denied telling security officer Martha Jefferson to "Shut the 'F' up, you bitch, you ain't nothing but a liar." He denied being aggressive toward the security officers, instead referring to his behavior as "reactive." Geaslin said he intervened between Shelton and Miller because Shelton was being aggressive

5

toward Miller. He admitted that Officer Dartez was holding his right arm and "could have been" preventing Shelton from being punched in the face. He admitted grabbing Shelton's neck with his left arm and leaving cuts and scratches on his neck.

Dr. Wade D. Schindler, an adjunct criminal justice professor at Tulane University, was tendered as an expert in security practice and procedures. He testified that the security guards surrounded Geaslin and Miller, threatening their personal space. He stated that the security officers were not properly trained and used excessive force against Geaslin. He maintained that the aggressive acts were initiated by the security personnel who surrounded the "old people." Dr. Schindler described the "triggering events" as Officer Dartez putting his face into Geaslin's face and Shelton's reaching to take the cell phone from Miller. On cross-examination, Dr. Schindler reviewed a portion of L'Auberge's security manual indicating that when involved in a conflict the security personnel should give the person their personal space. However, he said that these officers failed to give Geaslin adequate personal space. He testified that he understood that Geaslin called Jefferson a "fu****g liar." He further agreed the whole situation could have been avoided if Miller and Geaslin had just exited the casino. He admitted he stated that Miller stopped and requested a wheelchair "in a defiant way." He also admitted when reviewing the video that Miller was yelling at the security officers when they were six to eight feet away and not in her personal space.

Lernest Green, an officer at the Calcasieu Parish Sherriff's office, responded to L'Auberge's call following the incident. He testified that he saw the cuts and scratches on Shelton's neck and that Geaslin later admitted that he was wrong for grabbing Shelton's neck. He said that Geaslin claimed he was trying to get his phone back. He said that Geaslin did not indicate that anyone had punched

6

him or jumped on him. Green testified that Geaslin was arrested for the simple battery of Shelton. He further stated that Geaslin was under the influence of alcohol, specifically recalling that his speech was slurred that evening.

Christopher Lennette, Director of Security Risk and Transportation at L'Auberge, testified that he created all of the step-by-step guides and security procedures used by the casino. Lennette testified that he hired Martha Jefferson to be the security manager because he had trained her and she had sixteen years of experience in the gaming industry. He testified that he hired Edrick Boling, another security officer at the scene, who had sixteen years of experience as a security supervisor and sixteen years of experience as a deputy in Jefferson Davis Parish. Lennette said that Boling continued to work for both the casino and as a deputy. Lennette also hired Willie Dartez, who had graduated with a criminal justice degree from McNeese. Dartez is also employed with the Calcasieu Parish Sherriff's Office. Finally, Lennette hired David Shelton, who had a military background and had also worked at correctional facilities. Shelton testified in detail regarding the extensive training and testing security officers undergo. He described scenario training in which employees have to act out real situations that may be encountered such as what occurred here, otherwise known as a COA (cut off of alcohol). Lennette said that COAs are a common occurrence with about ten COAs occurring per every twenty-four hour period.

Lennette further testified that all COAs are recorded on videotape by the surveillance department, which is completely separate from the security department. Lennette then reviewed the step-by-step procedure entitled "Handling Intoxicated Guests," which he prepared. Lennette testified that he reviewed the tape and would even use it training new officers because:

> You can see the team, how they're very patient, they're very cordial, none of them are emotionally involved, they keep their space, they're polite with the guests, to include all the way to the actual take-down. It's as smooth and as safe as it possibly can be.

Lennette went on to testify that the policy is generally two officers per person if the patron becomes threatening. However, if the officers are female and the patron male, or as otherwise determined on a case-by-case basis, that number can be adjusted. He then testified regarding the no-photograph policy in place at the casino.

Martha Jefferson testified that she was the security manager on the day of the incident. She stated that she received training from the Louisiana State Police, the local sheriff's department, and the casino. She discussed on-going quarterly training, as well as daily fifteen minute pre-shift training that occurs at the start of every shift. She described training in using handcuffs, defense tactics, and various policies and procedures including COAs, and guest evictions. Jefferson described asking Geaslin and Miller to remove the Big Gulp cups. Then she described her arrival on the scene after Miller had been cut-off from alcohol. Jefferson said Miller did not understand why she was being cut-off. Jefferson described both Miller and Geaslin as having slurred speech, red faces, continually asking the same questions over and over again, eyes dilated, and breathing heavily.

Jefferson narrated a portion of the tape where she backed away from Geaslin and Miller because she said that Geaslin was spitting as he talked. She then stated that Geaslin told her to "shut up you f***ing bitch." Jefferson said that they were loud and disruptive and needed to be removed from the casino. At that point, she said Miller requested a wheelchair. She said Geaslin then called her a "f***ing bitch" again. A minute later Jefferson said Geaslin was calling her a "lying bitch," and telling her to "shut the f*** up" when she advised Miller that she could not

take a picture in the casino. Jefferson testified that she had told Miller at least twice that she could not take pictures in the casino. She further said that Officers Granger and Shelton also told Miller multiple times that she could not take pictures in the casino. She described the take-down as following L'Auberge policy and further described the arrival of two additional male officers as the hand-off technique because Geaslin indicated he did not want to talk to anymore "bitches."

Shelton described his extensive training that included take-down procedures. He stated that he was involved in two to three COAs per night. Shelton confirmed the profanity that Jefferson testified to. He further stated that after he first advised Miller not to take any pictures, she stated, "F*** that, I'm going to take these motherf****r's" pictures. He stated that he again advised her that no pictures were allowed, at which point Geaslin raised his right hand and pointed it into Shelton's face. Shelton said that Officers Boling and Dartez arrived on the scene shortly thereafter as it was escalating. He indicated that Jefferson gave him the nod to remove the phone from Miller, which, he did, placing it behind his back. Shelton described what ensued:

> At that point Mr. Geaslin turns toward me, reaches up with his left hand on the back side of my neck, started to come forward with his right hand. At that time I just put my right hand under his left arm pit, pushed him forward, and Mr. Dartez took control of his right arm, spun back around because he started to trip. I grabbed ahold of his belt buckle and start to help lower him down and Edrick Boling, Mr. Boling, grabbed his head and we lowered him down; get him to the floor; placed his hands behind his back and handcuffed him and stand him up.

Shelton said that his left hand remained behind his back during the entire take-down. He denied any punching, body slamming, or jumping up and down on Geaslin's leg.

9

Willie Dartez described his training. He testified that as he arrived on the scene, Geaslin was repetitively calling Jefferson a "bitch." As the situation escalated and Geaslin reached for Shelton, Dartez said that he grabbed Geaslin's right arm to prevent Geaslin from reaching Shelton. He went on to describe the take-down and denied punching, kicking, or jumping up and down on Geaslin.

Alan Zajic was tendered as an expert in the field of security practices with an emphasis on use of force. He discussed the detailed procedures and practices that L'Auberge has in place to conduct COAs and guest evictions. He described Geaslin as the aggressor with the security personnel responding by moving into a "protective mode." He noted that prior to Geaslin's escalating the situation all of the officers stood far back and kept the sides wide open, allowing a clear path for Geaslin and Miller to leave.

Zajic testified that Shelton adeptly removed the phone from Miller without even touching her hand. He then reviewed the video and concluded that excessive force was not used against Geaslin. He testified that Geaslin was brought down slowly and the entire incident was supervised by Jefferson. He further testified that physical force was used as a last resort in this case after attempting to solve the problem in many different ways. Zajic said that Geaslin and Miller did not give the security personnel any other options as they continued to provoke the situation beyond what it had to be and never exercised their option to walk out of the door. Zajic testified that he was going to ask for permission to use the video in his training because the L'Auberge personnel handled the situation so well.

The video tape evidence shows a multi-step, orderly, procedure in place by the casino to handle unruly and dangerous patrons. What started out with one officer eventually led to five as Miller and Geaslin's aggressive behavior intensified. All of the officers continually evidence calm, non-threatening

10

demeanors and actions. At most points during the videotape, the officers have their hands behind their backs and stand far away from Miller and Geaslin while they are being yelled at by them. Geaslin and Miller are often pointing their fingers in the officers' faces. Although the tape does not have audio, it is clear from the body movements that Geaslin and Miller were the only people behaving aggressively in any way. Moreover, the "takedown" lasted less than fifty seconds and involved no punching or jumping up and down on Geaslin as alleged in his petition. An officer has his knee on the back of Geaslin's knee while he is being handcuffed. Then several officers assist Geaslin in getting back to his feet.

Geaslin called his credibility into question many times on the stand. Although Geaslin argues that casino personnel should not be surprised that they have to deal with patrons who curse at them and are "loud and boisterous" (as was the plaintiff in *Saucier*), reasonable people could have found that Geaslin far surpassed the "loud and boisterous" level when he attempted to grab Shelton with his right arm and eventually did so with his left arm, leaving Shelton with cuts and scratches. L'Auberge personnel repeatedly demonstrated restraint in the face of Geaslin's escalating aggression, until he went too far and placed the safety of others in jeopardy. Reasonable people easily could have found that this entire situation was of Geaslin's own doing, and that the L'Auberge personnel responded appropriately and with minimal force. Accordingly, there is no manifest error in the jury's finding, and this assignment of error is without merit.

**JNOV**

In *Love v. Lewis,* 00-06, pp. 4-5 (La.App. 3 Cir. 10/11/00), 771 So.2d 220 222, *writ denied,* 00-3506 (La. 2/16/01), 786 So.2d 102, we stated:

> La.Code Civ.P. art. 1811 provides the basis for filing a Motion for JNOV. However, Article 1811 does not set forth any specific

11

grounds on which a trial court may set aside a verdict. Therefore, we rely on the well-settled jurisprudence that a JNOV may only be granted when the evidence points so strongly and overwhelmingly in favor of the moving party that reasonable people could not arrive at a contrary verdict on the facts at issue. *Peterson v. Gibraltar Sav. & Loan,* 98-1601(La.5/18/99); 733 So.2d 1198. Additionally, "[t]he trial court may not weigh the evidence, pass on the credibility of witnesses, or substitute the reasonable inferences of the facts for those of the jury." *McBride v. H. Brown Machine Shop,* 98-1271, p. 3 (La.App. 3 Cir. 3/31/99); 732 So.2d 650, 652, writ denied, 99-1288 (La.7/2/99); 747 So.2d 20, quoting *Webb v. Goodley,* 512 So.2d 527, 530 (La.App. 3 Cir.1987). In reviewing the grant of a JNOV, an appellate court must first determine whether the trial court erred in granting the JNOV. The appellate court does this by applying the same criteria as the trial court. *Anderson v. New Orleans Public Service, Inc.,* 583 So.2d 829 (La.1991). If reasonable people could have arrived at the same verdict, given the evidence presented to the jury, then the JNOV is improper. *Id.*

At the conclusion of Geaslin's Motion for JNOV, the trial court stated that there was a reasonable basis for the decision of the jury, and it declined to grant a JNOV. In *Lastrapes v. Progressive Security Insurance Co.,* 10-51, p. 5 (La. 11/30/10), 51 So.3d 659, 662 (quoting *Joseph v. Broussard Rice Mill, Inc.,* 00-0628, pp. 4-5 (La. 10/30/00), 772 So.2d 94, 99, the supreme court recently stated (emphasis added)):

> The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. *This rigorous standard is based upon the principle that when there is a jury, the jury is the trier of fact.*

The case before us presents classic credibility determinations and assessments of the evidence by the jury. Any reasonable person considering the evidence before the jury could find that L'Auberge did not use excessive force. As our foregoing review of the evidence shows, there is no error in the trial court's denial of Geaslin's motion for JNOV. This assignment of error is without merit.

12

## CONCLUSION

The judgment of the trial court in favor of the defendant-appellee, PNK, d/b/a L'Auberge Du Lac Hotel and Casino, is affirmed. All costs of this appeal are assessed against the plaintiff-appellant, Ed Geaslin.

**AFFIRMED.**