NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-1521

SHIRLEY LANGLEY, ET UX.

VERSUS

AMERICAN LEGION HOSPITAL

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 209-10573
HONORABLE DURWOOD WAYNE CONQUE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

ELIZABETH A. PICKETT
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Elizabeth A. Pickett, Judges.

AFFIRMED AS AMENED.

Nicholas J. Sigur
Attorney at Law
Post Office Box 81834
Lafayette, Louisiana LA 70598
(337) 205-2353
Counsel for Defendant/Appellant:
        American Legion Hospital

**Benjamin P. Mouton**
**Eric E. Helm**
**McGlynn, Glisson & Koch**
**Post Office Box 1909**
**Baton Rouge, Louisiana 70821**
**(225) 344-3555**
**Counsel for Plaintiffs/Appellants:**
     **Shirley Langley**
     **Gregory Langley**

**PICKETT, Judge.**

Husband and wife sued hospital for damages they claim to have suffered as a result of the wife's having been administered epinephrine intravenously rather than subcutaneously. For the following reasons, we amend and affirm the judgment of the trial court.

**FACTS**

On December 5, 2007, Shirley Langley sought treatment in the emergency room (ER) at the American Legion Hospital (the hospital) in Crowley after experiencing an allergic reaction to a bee sting. The initial treatment of epinephrine injected subcutaneously, as ordered by the ER physician, was successful, but Mrs. Langley developed a rebound reaction to the bee sting. To address the rebound reaction, the ER physician ordered that a second dose of epinephrine be administered subcutaneously, but it was administered intravenously.

The hospital's records show that immediately after the intravenous administration of the epinephrine, Mrs. Langley complained of pain in her head. Her heart rate increased from 101 beats per minute to 180-190 beats per minute, and her blood pressure rose from 136/55 to 205/129. Her reaction was diagnosed as sudden onset of supraventricular tachycardia, which is a regular fast heart beat caused by rapid firing of electrical impulses that originate above the heart's ventricles.[1] This reaction required the ER physician to perform "vagal massage," i.e., massage of the carotid artery in Mrs. Langley's neck.[2] The episode associated with the intravenous administration of the epinephrine lasted approximately one minute. Mrs. Langley was then admitted to the Intensive Care Unit with a diagnosis of allergic reaction to bee

---

[1] As defined in "Supraventricular Tachycardia–Topic Overview," *MedicineNet.com*, August 9, 2010, http://www.MedicineNet.com/ heart-disease.

[2] This explanation is garnered from the ER physician's history because a definition for the term "vagal massage" could not be found. *See also*, "Vagal Maneuvers for A Fast Heart Rate," *WebMD.com*, August 9, 2010, http://www.WebMD.com/a-to-z-guides.

sting and supraventricular tachydardia secondary to epinephrine. She was treated and monitored for approximately eight hours before being discharged.

Mrs. Langley and her husband Gregory sued the hospital for damages they claim to have suffered as a result of the episode. They claim the evidence introduced at trial shows this medication error caused measurable, permanent damage to Mrs. Langley's heart and permanent damage to the "peripheral nerves in her upper and lower extremities, resulting in pain and loss of sensation." They further claim the error caused Mrs. Langley to experience nightmares, intrusive memories, anxiety, panic attacks, sleep deprivation, weight loss, and bouts of sadness/tearfulness which she will likely continue to experience. They also assert Mr. Langley has suffered a loss of consortium with Mrs. Langley as a result of the episode.

At trial, the parties stipulated that the nurse's administration of the epinephrine intravenously, rather than subcutaneously as ordered, constituted a breach of the standard of care by the hospital. Therefore, the parties addressed only the issues of causation and damages at trial.

Mrs. Langley testified the episode caused her to suffer the worst pain she had ever suffered. Additionally, she testified she saw bugs crawling everywhere; she ground her teeth; her stomach hurt badly; her chest felt tight and painful; she felt as if she were constantly gasping for breath; and she felt anxious and agitated. Thereafter, Mrs. Langley sought treatment for pain and numbness in her extremities, anxiousness, nightmares, and other mental/emotional complaints. She was diagnosed with having five percent damage to her heart. Mr. and Mrs. Langley also testified that the effects of the episode on Mrs. Langley impacted their relationship with each other.

At the conclusion of the trial, the trial court took the matter under advisement and subsequently issued Reasons for Judgment in which it awarded Mrs. Langley

$25,000 in general damages[3] but denied Mr. Langley's claim for loss of consortium. Thereafter, the trial court signed a written judgment in accordance with its Reasons for Judgment. The Langleys and the hospital appealed the judgment.

## ASSIGMENTS OF ERROR

In their appeal, the Langleys assign two errors in the trial court's judgment:

(1) The trial court committed a legal error or, in the alternative, committed manifest error when it failed to award Gregory Langley damages for his loss of consortium, given that the following three requirements were met: (a) the parties stipulated that the defendant breached the standard of care, (b) the trial court confirmed that Shirley was injured by the breach through its award of general damages, and (c) both Gregory and Shirley's testimonies relevant to his loss of consortium claim were uncontested.

(2) The trial court's award of $25,000 to Shirley Langley was abusively low considering the severity of her physical and emotional injuries and the higher awards given in similar cases for similar injuries.

The hospital assigns one error:

(1) The trial court erred in awarding damages to Mrs. Langley in that there was no evidence that any act of the hospital caused damage to her.

## DISCUSSION

**Proof of Causation**

In its assignment of error, the hospital contends no evidence established the episode caused Mrs. Langley's reaction and argues the reaction Mrs. Langley suffered may have been caused by the epinephrine itself.

The Langleys had to prove by a preponderance of the evidence that the intravenous administration of the epinephrine caused Mrs. Langley's injuries and damages. *Clark v. Parker*, 08-941 (La.App. 3 Cir. 2/4/09), 2 So.3d 1262, *writ denied*, 09-401 (La. 4/13/09), 5 So.3d 165. "Proof is sufficient to constitute a preponderance when the entirety of the evidence, both direct and circumstantial, shows the fact sought to be proved is more probable than not." *Hebert v. Rapides Parish Police*

---

[3] The Langleys did not introduce evidence regarding their medical expenses; therefore, no award was made for those expenses.

*Jury*, 06-2001, 06-2164, p. 7 (La. 4/11/07), 974 So.2d 635, 642. We cannot reverse the trial court's determination that the Langleys met their burden of proof unless we find its factual findings are manifestly erroneous. *Miller v. PNK*, 11-216 (La.App. 3 Cir. 10/5/11), 76 So.3d 122.

> In its Reasons for Ruling, the trial court determined:
>
> The defendant hospital is responsible only for those damages which are directly attributable to [its] breach of the standard of care required by the law of medical malpractice. The plaintiff in this case has symptoms of pain and anxiety that her doctors have been unable to explain fully. There is a great deal of uncertainty in the medical testimony, and the court has found a definite lack of proof to a medical probability that Mrs. Langley's *present day complaints and medical issue* [sic] are causally connected to the incident at the defendant hospital.
>
> . . . .
>
> For these reasons and considering the arguments of counsel in post-trial briefs, the court awards general damages to . . . Shirley Langley in the amount of $25,000 for physical and emotional damages suffered as a result of the mistakenly IV injected epinephrine. For lack of proof, the court awards no damages to Gregory Langley for loss of consortium.

(Emphasis added.)

The hospital argues the trial court determined the Langleys failed to carry their burden of proof; therefore, it erred in awarding her damages. This reading of the trial court's Reasons for Ruling is too narrow and overlooks the totality of the evidence.

Mrs. Langley had a liver transplant in August 2007 and was recovering without complication when the episode occurred. Prior to her liver transplant, Dr. Sayed Feghali, a cardiologist, examined Mrs. Langley as part of the transplant protocol. After the episode, he examined her at the request of her transplant doctor. Dr. Feghali explained that when medication is administered intravenously as opposed to subcutaneously, it immediately enters circulation and has a "very acute" effect. Further, he explained that epinephrine is "a very, very potent simulant [sic] to the heart" and that the effects of epinephrine are complex. He described those effects as causing the heart rate to speed up extremely and blood pressure to increase to a very

high level. He also stated that epinephrine can cause the heart to spasm and result in the heart working overdrive because the oxygen supplied to the heart is less than the demand. Importantly, Dr. Feghali observed that when Mrs. Langley went to the hospital after the bee sting, her pulse and blood pressure were reasonably stable and remained so until the second dose of epinephrine was administered, indicating her response to the subcutaneous injection of epinephrine was normal.

Dr. Feghali's explanation of the effects of epinephrine administered intravenously, Mrs. Langley's normal reaction to the subcutaneous injection of epinephrine, the hospital's documentation of her physical reaction to the epinephrine administered intravenously, and her description of her physical and psychological reaction to it supports the trial court's determination that the Langleys proved the hospital's actions caused her damage. Accordingly, we find no error in its determination.

**General Damages**

The Langleys urge the trial court's award of $25,000 in general damages is excessively low. Trial courts are vested with "vast" discretion in awarding damages. *Guillory v. Lee*, 09-75, p. 14 (La. 6/26/09), 16 So.3d 1104, 1117. Damage awards are findings of fact and can be disturbed on review only if the record "clearly" shows the fact finder "abused its discretion in making its award." *Id.* (quoting *Wainwright v. Fontenot*, 00-492, p. 6 (La. 10/17/00), 774 So.2d 70, 74). Appellate courts must view relevant evidence "in the light which offers the most support to the trial court's judgment" when considering whether the fact finder abused its discretion. *Hardy v. Augustine*, 10-946, p. 5 (La.App. 3 Cir. 2/2/11), 55 So.3d 1019, 1023, *writ denied*, 11-470 (La. 4/25/11), 62 So.3d 92 (citing *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059).

The Langleys contend Mrs. Langley sustained injuries to her heart and peripheral nervous system, which have caused and will continue to cause her pain and

5

severely limit her quality of life. They also assert the episode caused her to experience severe mental and emotional effects which have not subsided or diminished. Moreover, they deny the injuries suffered by Mrs. Langley in an automobile accident in March or April 2008, which required her to be hospitalized for thirty days, caused any of these injuries or complaints. The Langleys' assessment of the medical evidence differs from our assessment of that evidence, and we find no abuse of discretion in the trial court's damage award of $25,000. Specifically, we examine Mrs. Langley's medical treatment pertinent to the episode.

After the episode, Mrs. Langley sought treatment from four doctors for complaints that she related to the episode: Dr. Feghali; Dr. Fabian Lugo, a neurophysiologist; Dr. Jennifer Pate, a psychiatrist; and a general practitioner she identified as Dr. Patel. Less than two weeks after the episode, Mrs. Langley sought treatment from Dr. Lugo, complaining that after the episode, she experienced significant pain and numbness in her upper and lower extremities. Dr. Lugo's initial examination did not reveal any objective evidence supporting Mrs. Langley's subjective complaints, and testing recommended by him was normal and revealed no signs of sensory or motor dysfunction.

Dr. Lugo initially testified that because Mrs. Langley had no such problems before the episode, he assumed there was a direct connection between the epinephrine and her complaints, which indicated a cause-effect relationship. He later explained, however, that he thought "something else was going on, not just the initial insult" of the episode. Moreover, throughout his testimony, Dr. Lugo stated he was not satisfied that the episode caused any nerve damage in Mrs. Langley. Ultimately, Dr. Lugo testified, "All I can say is that she has symptoms of neurological dysfunction. I do not know exactly why. I just want to make it clear."

Mrs. Langley next saw Dr. Feghali. Contrary to Mrs. Langley's testimony, Dr. Feghali did not determine she had suffered a massive heart attack as a result of the

6

episode. Rather, he opined that while her heart was damaged, the damage was minor, quantifying it at five percent or less, and that her overall heart function was very good. With regard to whether the episode caused her heart damage, Dr. Feghali testified it was "conceivable" the damage was "secondary to the allergic reaction to the bee sting *and/or* the epinephrine IV injection." (Emphasis added.) Dr. Feghali opined that Mrs. Langley would live a normal life, unless some as yet unknown health issue combined with the minor damage to her heart to increase that the damage.

Dr. Feghali recommended that Mrs. Langley see a psychiatrist due to the anxiety and stress she exhibited during an appointment with him, and Mrs. Langley sought treatment from Dr. Pate. She first saw Dr. Pate on June 16, 2009. Dr. Pate recorded Mrs. Langley's complaints on her first visit as chronic back pain from an automobile accident; being anxious and traumatized following injury from the episode; experiencing frequent nightmares and intrusive memories; experiencing frequent episodes of tearfulness; being anxious about her lawsuit against the hospital; having decreased appetite and weight loss due to pain; experiencing sadness; having low interest and variable energy; and limping "due to nerve damage." In July 2009, Mrs. Langley reported to Dr. Pate that she was better, but anxious. During Mrs. Langley's last visit in April 2010, Dr. Pate recorded that she was preoccupied with the aftermath of the episode and that her sister had died six months earlier.

While the medical evidence does not establish to a medical probability that Mrs. Langley suffered heart damage or nerve damage as a result the episode, it clearly shows she experienced physical pain and psychological distress during the episode and continued to experience psychological distress after the episode. The trial court agreed but concluded Mrs. Langley did not prove she continued to suffer such pain and/or distress at the time of trial. Mrs. Langley testified Dr. Pate recommended additional treatment, but she did not pursue that treatment or any other treatment for

7

her emotional distress and/or anxiety for more than one year before trial. Dr. Pate also recommended a foot evaluation that Mrs. Langley never obtained. Additionally, Mrs. Langley did not pursue additional testing recommended by Dr. Lugo. Therefore, we find no error with the trial court's conclusion that the Langleys failed to prove Mrs. Langley continues to suffer physical pain or suffering or psychological suffering.

For these reasons, we conclude the medical evidence does establish that Mrs. Langley suffered physical and psychological damages as a result of the episode, but it does not establish those damages are so extensive that the trial court's $25,000 award is insufficient.

**Loss of Consortium**

The Langleys complain the trial court erred in refusing to award Mr. Langley damages for loss of consortium. To succeed on Mr. Langley's loss of consortium claim, they had the burden of proving: "(1) the liability of the defendant, (2) his . . . spouse's damages, and (3) his . . . consequent loss of consortium damages." *Bellard v. S. Cent. Bell Tel. Co.,* 96–1426, p. 21 (La.App. 3 Cir. 8/27/97), 702 So.2d 695, 707, *writ denied,* 97–2415 (La. 12/12/97), 704 So.2d 1202.

As argued by the Langleys, we need only consider the last element of Mr. Langley's loss of consortium claim because the stipulation regarding the hospital's standard of care beach and the trial court's award of damages to Mrs. Langley satisfy the first two elements of his claim. In reviewing this assignment, we are mindful that: "Loss of consortium is more than just a loss of general overall happiness, it also includes love and affection, society and companionship, sexual relations, the right of performance of material services, the right of support, aid, and assistance, and felicity." *Id.*

The Langleys each addressed this element of Mr. Langley's claim in their testimony. Mr. Langley testified that Mrs. Langley's injuries have affected their romantic life and greatly limited their ability to do activities they previously enjoyed

together, like fishing, dining, and traveling outside the home. He also testified that Mrs. Langley has frequent nightmares which wake him during the night and that he is so concerned for her when she is alone that he often calls twenty to thirty times a day to check on her. Mr. Langley further testified that there are times he must "walk on eggshells" because one of her medications causes her to have mood swings and he does not know when "she's going to explode." Both testified that their sex life has been curtailed. Mrs. Langley explained her fear that any exertion during sex could have a negative impact on her heart. Both testified that Mrs. Langley's inability to drive, due to side effects of one of her medications, and her other limitations restrict Mr. Langley's freedom.

This testimony shows that the trial court erred in finding that Mr. Langley did not prove his loss of consortium claim, and we award him $2,500.

## DISPOSITION

The judgment of the trial court is amended to award Gregory Langley $2,500 in damages for loss of consortium; it is affirmed in all other respects. The costs of this appeal are assessed to the American Legion Hospital.

**AFFIRMED AS AMENDED.**