MARION F. EDWARDS, Chief Judge.
| gPlaintiffs/appellants, Felton Goudia, Jr., Anthony Goudia, Chenell Goudia-Brown, Bethany Goudia Lovett, Chad Hi-laire, and Doris Ann Franklin, on behalf of her minor child Jayvon Franklin (“plaintiffs”), appeal a jury verdict as well as the denial of a Motion Notwithstanding the Verdict, in favor of defendants/appellees, Dr. Willard K. Mann (Dr. Mann) and Louisiana Mutual Medical Insurance Company (LAMMICO), dismissing their claims.
Felton Goudia, Sr. (Mr. Goudia) died while hospitalized at Life Care Hospital of New Orleans, LLC (Life Care) on April 12, 2002. The general facts are that Dr. Mann treated Mr. Goudia, a diabetic, at Kenner Regional Medical Center (Kenner Regional) and at Life Care Hospital (Life Care), a separate facility within the Ken-ner building. Mr. Goudia was admitted for treatment for surgery that involved the amputation of Mr. Goudia’s left great toe, the revision of amputation sites at two other toes, and a skin graft to his left foot. Following surgery, and despite the fact that he could not be fully aroused, he was transported to Life Care |son the third floor of the hospital. While there, he was placed under the care of Nurse Rosa Hebert. Nurse Hebert determined that Mr. Goudia was unresponsive and reported this to her supervisor, Allen Nash, a registered nurse. Mr. Goudia’s vital signs began to deteriorate, and he became tachycardic. He remained unresponsive to stimuli and continued to deteriorate throughout the day. Later that night, Mr. Goudia died.
A complaint of malpractice filed by plaintiffs was evaluated by a Medical Review Panel. The Panel returned a unanimous opinion that Mr. Goudia was properly informed of the procedure; that the procedure was indicated and properly performed; that Dr. Mann’s post-operative treatment of Mr. Goudia was proper; and that Dr. Mann exercised good judgment based upon the information he received. The Panel concluded that the evidence did not support the conclusion that Dr. Mann failed to meet the applicable standard of care. The present lawsuit was subsequently filed.
Plaintiffs’ petition alleged that Mr. Gou-dia’s death was caused by the acts and omissions of Dr. Mann and Life Care through its employees, Nash, Hebert, Col-lette Jackson, and Adele Guerringer. Named as defendants were Dr. Mann, LAMMICO, Life Care, and the Louisiana Patients’ Compensation Fund.
Prior to trial, plaintiffs settled with Life Care, Nurse Hebert, and the Louisiana Patients’ Compensation Fund. The matter proceeded to a jury trial only against Dr. Mann and LAMMICO. The jury found that Dr. Mann did not breach the standard of care required of him, and the trial court dismissed the case. The court later denied a Motion for Judgment Notwithstanding the Verdict (JNOV). Plaintiffs appeal the verdict and judgments.
At trial, Sandra Pitre testified that she was a nurse in the recovery room at Ken-ner Regional at the time Mr. Goudia was a surgical patient. She testified that,
14aIthough Dr. Mann was the surgeon, Dr. Stock, a nephrologist, was his primary physician. Following his surgery, Mr. Goudia’s vital signs were stable but he was not responsive. However, nursing notes indicated that he was “arousable to verbals,” which' does not really mean awake and alert. Prior to being discharged to Life Care, Mr. Goudia was seen by Dr. Stock, who did not object to the discharge. The anesthesiologists also released him. Nurse Pitre helped transport Mr. Goudia *368 to Life Care, during which time he remained unresponsive. Life Care, which is like a long-term ICU, took in very sick patients. Dr. Mann was not notified because Mr. Goudia’s condition was not a surgical issue, such as bleeding or a surgical complication.
Nurse Hebert testified that she was a licensed practical nurse employed at Life Care at the time Mr. Goudia was admitted following surgery. The charge nurse, RN Alan Nash, was her supervisor. According to Nurse Hebert’s notes, Mr. Goudia was unresponsive when he was admitted, and he did not wake up after the administration of IV fluids. She had never seen this in a post-operative patient. His pupils were non-reactive to light, and he could not be aroused with hard or painful stimuli. Nurse Hebert was concerned. At some point, Dr. Mann was paged. Hebert mentioned to him that the patient was unresponsive, and Dr. Mann gave orders for medication (Narcan) to raise his blood pressure and for IV fluids. After the medications were administered, Mr. Goudia’s conditioned improved somewhat. A short while later, as a result of a blood sugar reading, Dr. Mann was again contacted and new orders were given regarding IV fluids. Mr. Goudia’s blood pressure dropped again. After contacting Dr. Mann again, he ordered Dilantin to be given in the IV and shortly thereafter, Nurse Hebert went off duty. Nurse Hebert was concerned that Dr. Mann did not come to see Mr. Goudia after being advised that he remained non-responsive. She was certain that she spoke Rwith Dr. Mann about the administration of Dilantin, because Mr. Goudia was unresponsive, although she was uncertain as to whether she made two or three phone calls to him.
RN Alan Nash testified that he was the charge nurse at Life Care on the day of Mr. Goudia’s death. He supervised Nurse Hebert and had no reason to doubt her care of patients or her documentation of records. His recollection of this case was based on review of the medical records.
Adele Guerringer was a nurse at Life Care in 2002 and she, too, only recollected the matter after review of the medical records. Nurse Hebert was very thorough. Nurse Guerringer’s notes indicate that she took over Mr. Goudia’s case when Nurse Hebert’s shift was over, and she, too, found him unresponsive with non-reactive pupils. His vital signs were checked at about 8:00 p.m. at which time his heart rate and pulse were regular. His breathing was normal, and he did not appear to be in distress. She did not observe any condition that would make her call a physician. Mr. Goudia died a short time later.
Dr. Mann testified that Mr. Goudia suffered from severe diabetic neuropathy and kidney disease, and he was on dialysis. He also had severe cardiomyopathy and severe peripheral vascular disease. He had been an “exceptionally chronically ill” man. He had burned his foot, but, because of the neuropathy, he did not realize the extent of the injury and did not seek treatment immediately. Dr. Mann wanted to treat him with hyperbaric oxygen treatment to avoid amputation, and Mr. Goudia was admitted to Life Care. During this time, Mr. Goudia had a series of debride-ments at Kenner Regional, which procedures removed non-viable tissue. Mr. Goudia had an episode of seizures and was transferred to Kenner Regional. A CT scan revealed a small infarct or blockage on the brain that caused atrophy in certain areas of the brain. The atrophy was way beyond his age of fifty-four years, |fiand there were multiple areas of ischemic-type events. This was consistent with his other medical problems. Mr. Goudia returned to Life Care for continuation of treatment. The hyperbaric treatment rendered an *369 “unbelievable” response, so that Mr. Gou-dia would not lose his leg or foot, but only some toes.
The surgery was originally scheduled for April 11, 2002, but, due to a spike in temperature, Dr. Mann consulted Dr. Pen-ico, an infectious disease specialist. After consulting with Dr. Penico, it was determined that the temperature spike had improved, and they decided to go ahead with the surgery the next day to prevent or retard an infectious process. Although he had suffered intermittent episodes of confusion, Mr. Goudia was not confused when Dr. Mann saw him. Dr. Mann explained the situation to Mr. Goudia and stated that the surgery would be postponed for a day. The patient had no problem conversing or understanding. On the morning of surgery, Mr. Goudia was “up for it.” He had already agreed to the surgery, but no consent form was signed that day because he felt too shaky.
The surgery went exceptionally well, and Dr. Mann had great hope that Mr. Goudia would be able to go home. In the recovery room, the patient was groggy but doing well. Mr. Goudia nodded at him when told everything had gone well. He was post-anesthetic, awake, and responsive. There was no one in the waiting room to speak with; Mr. Goudia’s family had not been informed that the surgery had been rescheduled due to privacy issues, and it was felt that Mr. Goudia could communicate with his family as he wished. There was no one in his family that the doctor had spoken with on a regular basis. Mr. Goudia had been in danger of developing sepsis from the time of his burn, so he had been placed on antibiotics with a plan to remove the toes, which were expected to become gangrenous. Surgery was performed to prevent sepsis. Following surgery, antibiotics were presumed, the patient would be monitored, and Dr. Mann was to be notified if there were any extreme changes in status.
If there was trouble arousing a patient after surgery, the first person to be called would be the anesthesiologist.
When Nurse Hebert first called him, she reported his vital signs and said the patient’s blood pressure had dropped. She also said he was “hard to arouse” and Narcan, which counteracts the effects of other narcotic medication, was ordered. She did not say that Mr. Goudia was unresponsive. Dr. Mann felt that, because Mr. Goudia was a dialysis patient, his body might be slow to clear the anesthesia. He ordered albumin, which is very concentrated, to pull fluid into the body because he did not want to flood the patient, who would not be receiving dialysis that day, with fluid. Normal amounts of saline would have killed him. On the second phone call, Nurse Hebert told him that Mr. Goudia’s pressure had improved, his pulse was better, and his blood sugar had gone down. He ordered normal saline. If there is a change in neurological status, the nurse is supposed to inform him. Again, Dr. Mann was not told that the patient was non-responsive. He did not give an order for Dilantin because it can lower the blood pressure. Nurse Hebert may have told him she could not give the Dilantin orally, and Dr. Mann may have told her Dilantin could be given via IV later “if we need to.” The third call he got with regard to Mr. Goudia stated that he was in a code status.
Dr. Mann testified that it is not unexpected that a patient with Mr. Goudia’s problems had probable blockages in his heart and could die of an arrhythmia.
Dr. Mann was shocked to discover the entries regarding Mr. Goudia’s unresponsiveness, in particular non-responsive pupils, as these are serious red flags. If he *370 had been notified of this, he would have checked Mr. Goudia immediately.
18Pr. Michael S. Hickey was accepted as an expert in the field of general surgery. He testified that he reviewed the medical records of Mr. Goudia, as well as relevant depositions, including that of Dr. Mann. Based on the information, Dr. Hickey opined that the treatment received by Mr. Goudia between 8:80 p.m. and the time he died was below the standard of care. Mr. Goudia had been responsive and reactive, and, after being transferred to Life Care, there was documentation that he was unresponsive, indicating a significant change. Between 10:05 a.m., when he left the recovery room, and 10:20 a.m., when he was brought to Life Care, something happened, and there were definite neurological changes. He may have had septic shock, he may have had a stroke, or he may have had some event associated with hypoglycemia. Upon being apprised of the situation, a physician should have attended to the patient by calling another physician, transferring him to ICU, or seeing the patient. In Mr. Goudia’s case, his blood pressure was low, his respiratory rate was high, he was unresponsive, and he had non-reactive pupils. He had blood sugar problems. His dilated pupils indicated hypotension or low blood glucose, not narcotics. The order to give saline solution “half normal” would not increase the blood volume enough; he should have been given normal fluid volume. After Dr. Mann was informed that his patient was lethargic, not easily aroused and had low blood pressure, he should have seen the patient or should have had another physician do so. Dr. Hickey believed that Dr. Mann departed from the standard of care expected of general surgeons. Had Dr. Mann attended Mr. Goudia, he had a chance of survival even in light of his general condition.
Dr. Hickey rendered two reports, which were introduced into evidence. There, among the other factors to which he testified, he criticized Dr. Mann for not recognizing that Mr. Goudia was becoming septic prior to surgery; for proceeding | awith a general anesthetic when a general block could have been used; for not sending Mr. Goudia to ICU following surgery; for not specifying particular monitoring guidelines; and for other actions and non-actions (where Dr. Hickey assumed Dr. Mann had been fully informed of the patient’s condition by the nursing staff). Dr. Hickey also had numerous criticisms regarding failures of the nursing staff.
Dr. Julius Levy, a general surgeon, was a member of the Medical Review Panel on the present case. Prior to rendering the panel opinion, he reviewed medical records and depositions. Dr. Levy believed that the surgery was necessary because, without it, gangrene would have progressed. Immediately following the burn wound, it would not have been in the patient’s best interest to amputate his foot without attempting to heal it via hyperbaric treatment and antibiotics. It appears that the surgery was properly performed. The statistics on the nursing flow sheets indicated that Mr. Goudia’s breathing was rapid, but not labored, he had good pulses in his extremities, and, although his blood pressure was low, it was also low when he got to the operating room. Although there was some degree of sepsis, Dr. Levy did not believe Mr. Goudia was in septic shock. If he had been in septic shock when released from post-operative care, he would likely have been dead by 3 in the afternoon. Further, Mr. Goudia did not exhibit the signs of shock, such as cold clammy skin, a severe drop in blood pressure, pallor of the arm and leg, and he would have been totally non-responsive.
*371 It was not a problem that Mr. Goudia was sent to Life Care instead of the hospital ICU. It was appropriate for Dr. Mann to accompany Mr. Goudia to the recovery room and then leave. The decision of when a patient leaves recovery is that of the anesthesiologist. A qualified nurse should be expected to recognize problems with certain statistics, such as blood pressure, respiration, and pulse, linwithout being given a written order. When Dr. Mann was told of Mr. Goudia’s low pressure and difficulty waking, the medications he ordered were appropriate. Because Mr. Goudia was a dialysis patient and had had congestive heart failure, it would be wrong to overload him with an excess of IV fluids. When told that Mr. Goudia’s blood sugar was low, Dr. Mann’s order of one-half saline solution was low and, thus, appropriate, giving him enough glucose without too much fluid. You can assess a patient to a large degree over the phone with a nurse.
When reviewing for the Medical Review Panel, Dr. Levy relies mostly on the medical records, although many times facts come out on statements and depositions that are pertinent and enable him to examine the records more carefully. On cross-examination, Dr. Levy opined that Mr. Goudia’s condition was such that, had a doctor been at his bedside, there was nothing more that could have been done. Mr. Goudia did not die because he was unattended by a physician, but, rather, he died because of his illnesses.
Dr. Michael Williams, an expert in anesthesiology, testified that he provided anesthesia to Mr. Goudia for the surgery. Prior to the surgery, Dr. Williams discussed it with the patient, who knew he had to have the operation. If Dr. Mann had requested an inappropriate type of anesthesia, Dr. Williams would not have agreed to give it. Dr. Williams administered a number of anesthesia medications, including Diprivan, Rocuronium, a neuro-muscular blocker; Fentanyl, Lidocaine, and several others. It was not a breach of care for Dr. Mann to order general anesthesia, as it was fairly light and the surgery was relatively short. Mr. Goudia’s blood pressure during surgery was lower than usual, but that is very common during general anesthesia. Ephedrine was given to maintain his blood pressure. After surgery, Dr. Williams accompanied the patient to the recovery room. Mr. Goudia was stable and arousable, but sleeping lightly. If stimulated, he would | nopen his eyes. The choice of anesthesia had nothing to do with Mr. Goudia’s death; rather, it was his pre-existing illnesses and postoperative course. There was no indication in the report by Nurse Pitre that the patient was in distress.
On appeal, plaintiffs contend that the jury erred in determining that Dr. Mann did not breach the applicable standard of care, and the trial court erred in denying the JNOV filed on their behalf. They urge that it was below the standard of care for Dr. Mann to fail to personally attend Mr. Goudia, or to summon another physician to do so, after having received the phone calls from Nurse Hebert informing him of the patient’s change in condition following surgery, and for him to lie unattended by a doctor for over ten hours.
Medical records, including the nursing notes from Life Care on April 12, 2002, were introduced into evidence. In the chart records, Nurse Hebert noted the physicians’ first orders for Albumin and Narcan; the low flow IV fluid; and, later, for Dilantin “IVPB slowly run for 2 hrs[.]”; and, finally, that Mr. Goudia was pronounced dead. It is not clear when Dr. Mann initialed those entries.
The standard of review on appeal is as follows:
*372 It is well-settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of manifest error or unless it is clearly wrong.... To reverse a fact-finder’s determination, the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and that the record establishes that the finding is clearly wrong. Mart v. Hill, 505 So.2d 1120 (La1987). Where the jury’s findings are reasonable, in light of the record viewed in its entirety, the court of appeal may not reverse. Even where the court of appeal is convinced that it would have weighed the evidence differently to reach a different result, reversal of the trial court is improper unless the trial court’s ruling is manifestly erroneous, or clearly wrong....
[[Image here]]
... [Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, where conflict exists in the testimony.... However, where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact-finder would li2not credit the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination.... [1]
La. R.S. 9:2794, in pertinent part, provides:
A. In a malpractice action based on the negligence of a physician ... the plaintiff shall have the burden of proving:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians ... licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care, the plaintiff suffered injuries that would not otherwise have incurred.
The plaintiff must establish the standard of care applicable to the charged physician, a violation by the physician of that standard of care, and a causal connection between the physician’s alleged negligence and the plaintiffs injuries resulting therefrom.[2] Whether alleged malpractice constitutes negligence is a question for the *373 jury.[3] With respect to causation, a plaintiff must prove by a preponderance of evidence that he suffered injury due to a defendant’s conduct.[4] The issues in loss of chance of survival eases are whether the tort victim lost any |ischance of survival because of the decedent’s negligence and the value of that loss.[5] The plaintiff need not show that the decedent would have survived had she received the appropriate treatment; rather the plaintiff need only show that the decedent had a chance of survival which was denied as a result of the defendant’s negligence.[6] The burden of proof in such case is by a preponderance of evidence.[7]
In the present case, on appellate review we find no manifest error in the jury’s findings and conclude such findings were reasonable, in light of the record viewed in its entirety. The jury’s findings appear to turn largely on a credibility finding in favor of Dr. Mann. Although Nurse Hebert testified that she informed Dr. Mann of Mr. Goudia’s condition, Dr. Mann testified that he was not made aware by the Life Care nursing staff that Mr. Goudia was unresponsive and had fixed and dilated pupils. Dr. Mann was shocked to learn of the existence of these unreported “red flag” symptoms and would have taken action had they been conveyed to him.
Dr. Levy opined that a qualified nurse should be expected to recognize problems with certain statistics, such as blood pressure, respiration, and pulse without being given a written order. In his medical opinion, Mr. Goudia did not die because he was unattended by a physician, but, rather, he died because of his illnesses, and, had a doctor been at his bedside, there was nothing more that could have been done. Although his opinion conflicted with that of Dr. Hickey, the rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound.[8] The evaluation of and resolution of conflicts in expert testimony are factual issues to be 114resolved by the trier of fact, and the determinations of the fact finder should not be disturbed on appeal in the absence of manifest error.[9]
Even absent a credibility question, plaintiffs argue that Nurse Hebert conveyed to Dr. Mann the “change in condition,” which should have triggered his immediate intervention. They contend that the issue is whether or not Dr. Mann, if he had been informed at 3:30 p.m. of such change as testified to by Nurse Hebert, could have made an earlier diagnosis of a dangerous condition that called for a different course of treatment. If so, the second question is whether Dr. Mann’s failure to undertake that course of treatment decreased Mr. Goudia’s chances of survival. There is no evidence in the record that supports such a *374 conclusion. Dr. Hickey testified that, between the time Mr. Goudia left the recovery room and 10:20 a.m., when he was brought to Life Care, “something happened” to cause definite neurological changes. The nursing care notes indicate that Mr. Goudia was categorized as “non-responsive” upon his arrival at Life Care, and, although his blood pressure and blood sugar waxed and waned, this problem did not. Interestingly, as late as 8:00 p.m., Nurse Guerringer did not observe any condition that would cause her to call a physician.
Dr. Hickey opined that, among. other things, Dr. Mann should have transferred Mr. Goudia to ICU; should have had him assessed for a stroke or other central nervous system injury; should have administered more Narcan; should have ordered additional blood tests; should have evaluated Mr. Goudia; and should have administered the appropriate fluids to resuscitate him. This latter finding, as with several others, assumed Mr. Goudia was in septic shock, of which there is no evidence in the record. Dr. Hickey did not assess what the quantitative chances of survival would have been had any of these measures been taken. The testimony 115and evidence support a conclusion that a significant change occurred by the time Mr. Goudia was assessed at Life Care. There is no evidence in the record that any of the procedures suggested by Dr. Hickey would have increased the chances that Mr. Goudia would have survived whatever neurological event occurred.
The Louisiana Supreme Court considered loss of chance of survival in a cardiac arrest case. There the court discussed the evidence in the record and stated:
Plaintiffs seem to argue that we should assume that the defendants’ failure to employ preventive treatment measures decreased the patient’s chances of survival. It is true that one can logically assume that certain alternative methods of treatment, such as moving the patient to intensive care and placing her on a heart monitor, would have constituted an effort to decrease the risk that she would go into cardiac arrest. But would the risk of cardiac arrest actually have been decreased? This is a question which the record before us does not answer, and absent at least some evidence on the issue, we cannot simply assume that the defendant’s failure to employ a more active course of treatment denied this heart patient a chance of survival.[10]
A similar analysis applies here. There is simply no evidence in the record as to whether treatment undertaken earlier would have provided Mr. Goudia a chance of survival that he otherwise would not have had.
The standard to be used in determining whether a JNOV has been properly granted has been set forth in our jurisprudence as follows:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the *375 motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.[11]
|1fiThe standard of review for a JNOV on appeal is a two part inquiry. In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether or not to grant the motion. After determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review.[12] If reasonable people could have arrived at the same verdict, given the evidence presented to the jury, then the JNOV is improper.[13]
As we have already reviewed the jury’s findings and found no manifest error, we cannot say that the jury’s verdict as finally rendered was unreasonable or. clearly contrary to the law and the evidence.
For the foregoing reasons, the verdict and judgments are affirmed.

AFFIRMED

. Little v. Boston Scientific Corp., 08-271 (La.App. 5 Cir. 1/13/09), 8 So.3d 591, 597, writ denied, 09-0546 (La.4/17/09), 6 So.3d 801 (citing Rabalais v. Nash, 06-0999 (La.3/9/07), 952 So.2d 653, 657).

. Braud v. Woodland Vill., L.L.C., 10-0137 (La.App. 4 Cir. 12/8/10), 54 So.3d 745, 750, reh'g denied, (1/13/11), writ denied, 11-0311 (La.4/1/11), 60 So.3d 1254 (citing Pfiffner v. Correa, 94-0924, 94-0963, 94-0992 (La.10/17/94), 643 So.2d 1228, 1232; Beaucoudray v. Walsh, 07-0818 (La.App. 4 Cir. 3/12/09), 9 So.3d 916, 923).

. Id.

. Banister v. Day, 08-835 (La.App. 5 Cir. 5/26/09), 13 So.3d 229, 232-33, writ denied, 09-1529 (La.10/9/09), 18 So.3d 1286; See also, Gordon v. La. State Univ. Bd. of Supervisors, 27,966 (La.App. 2 Cir. 3/1/96), 669 So.2d 736, writ denied, 96-1038 (La.5/31/96), 674 So.2d 263.

. Smith v. State, Dep’t of Health and Hosp., 95-0038 (La.6/25/96), 676 So.2d 543; Greer v. Lammico, 34,058 (La.App. 2 Cir. 12/22/00), 779 So.2d 894, 899-900, writ denied, 01-0445 (La.4/27/01), 791 So.2d 116.

. Greer v. Lammico, supra.

. Braud v. Woodland, supra.

. Galen-Med, Inc. v. Porter, 05-0788 (La.App. 4 Cir. 3/29/06), 928 So.2d 681, 688-89 (citing Lasyone v. Kansas City S. R.R., 00-2628 (La.4/3/01), 786 So.2d 682).

. Id.

. Smith v. State through Dep’t of Health & Human Res. Admin., 523 So.2d 815, 821 (La.1988) (emphasis as found in the original).

. Davis v. Wal-Mart Stores, Inc., 00-0445 (La.11/28/00), 774 So.2d 84, 89 (citations omitted).

. Id.

. Miller v. PNK, 11-216 (La.App. 3 Cir. 10/5/11), 76 So.3d 122, 130 (citing Anderson v. New Orleans Pub. Serv., Inc.., 583 So.2d 829 (La.1991)).